IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

|  |  |  |
|---|---|---|
| AFFLUENT ADS, LLC, | : | |
| | : | |
| | : | Civ. A. No: _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOVAN CAPUTO, PHILLIP LYNCH, | : | |
| and ADTELLIGENT MEDIA, LLC, | : | |
| | : | |
| Defendants. | : | |
| | : | |

## COMPLAINT FOR INJUNCTIVE RELIEF AND DAMAGES

Affluent Ads, LLC ("Affluent Ads," "Plaintiff," or the "Company"), by and through its undersigned counsel, hereby asserts the following Complaint against Defendants Jovan Caputo ("Caputo), Phillip Lynch ("Lynch"), and Adtelligent Media, LLC ("Adtelligent") (collectively, "Defendants;" excluding Adtelligent, the "Individual Defendants") seeking injunctive relief and monetary damages.

## PRELIMINARY STATEMENT

1.    This is an action about theft and misappropriation of trade secrets by two managerial employees unfairly competing with their employer.  Affluent Ads brings this action against Caputo and Lynch, two former Affluent Ads' senior managerial employees, and the company they created – while still employed by Affluent Ads – that unlawfully competes with Affluent Ads, to cease their illicit conduct, recover the Company trade secrets and confidential information Defendants' misappropriated, preclude Defendants' from unlawfully competing in violation of their contractual, statutory, and common law obligations, and recover the damages suffered by Affluent Ads because of Defendants' prior and ongoing conduct.

1

2.     Caputo's and Lynch's scheme was audacious in its outright unlawfulness and
brazen in its flagrant disregard of their obligations to Affluent Ads.  While employed by Affluent
Ads, Caputo and Lynch, two senior managers who reported directly to the Chief Executive
Officer and were responsible for a line of business that generated millions of dollars in revenue,
set up Adtelligent as a competitive business to perform the very same services marketed and
performed by the Affluent Ads business unit they ran.  Caputo and Lynch relied upon Affluent
Ads' trade secrets and confidential information – including, but not limited to, client and other
industry partner information and relationships -- to divert opportunities to this new company they
formed, Adtelligent, and away from their employer.  In furtherance of their scheme, Caputo and
Lynch set up a separate bank account for Adtelligent at the same bank used by Affluent Ads to
funnel money for their own benefit away from the Company.   Upon information and belief, this
bank account was used by Caputo and Lynch as a means of conducting their wrongful,
competitive business, and was also used by them to purposely mislead Affluent Ads' clients into
believing that the payments they made to Adtelligent's bank account for services rendered by
Affluent Ads were in fact payments being made to Affluent Ads' bank acccount for those
services, thus commandeering money intended for their employer – conduct no more lawful than
an employee skimming cash out of a company's cash register.  In addition, Affluent Ads
understands that the Individual Defendants engaged in other unlawful competition outside of
Adtelligent, including individually servicing Affluent Ads' clients and keeping the revenue for
themselves.  Upon information and belief, Caputo and Lynch diverted hundreds of thousands of
dollars into Adtelligent and otherwise and currently continue to operate Adtelligent in
contravention of their obligations.  When confronted with their misconduct, Caputo and Lynch
refused to take responsibility for their actions, claimed that they or their lawyer would contact

2

Affluent Ads' counsel, and have not been heard from since. Under law and equity, Defendants should not be permitted to continue to benefit from their unlawful actions, and the Company should be compensated for the harm that already has been done.

## JURISDICTION AND VENUE

3.      This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1332. This is an action between citizens of different states; Affluent Ads seeks actual, compensatory and punitive damages with a present monetary value, exclusive of costs and interest, well in excess of $75,000; and there exists complete diversity of citizenship.

4.      This Court also has jurisdiction pursuant to 29 U.S.C. § 1331, as Affluent Ads' claim pursuant to the Defend Trade Secret Act ("DTSA"), 18 U.S.C. § 1832, *et seq.*, arises under a law of the United States.

5.      Venue is proper in this Court pursuant to 28 U.S.C. § 1391 because a substantial part of the events or omissions giving rise to this action and upon which the allegations in the Complaint are based occurred within this District. In addition, both Caputo and Lynch explicitly consented to the personal jurisdiction of federal or state court in Philadelphia County, Pennsylvania for "all disputes arising from or relating to" the Invention, Non-Disclosure, Non-Solicitation, and Non-Competition Agreement (the "Non-Compete Agreement" or the "Agreement") they each entered into and whose terms they have violated through their conduct described herein. A true and correct copy of the Caputo Non-Compete Agreement is attached hereto as Exhibit 1 and a true and correct copy of the Lynch Non-Compete Agreement is attached hereto as Exhibit 2.

3

## PARTIES

6.      Plaintiff is a limited liability company formed in New Jersey, with a principal

place of business located at 3020 Market Street, Suite 535, Philadelphia, Pennsylvania 19104.

7.      Defendant Jovan Caputo is an individual and a citizen of the State of New York,

residing at 78 Ketewamoke Avenue, Babylon, New York 11702

8.      Defendant Phillip Lynch is an individual and a citizen of the State of New York,

residing at 141-08 Rockaway Beach Boulevard, Belle Harbor, New York 11694.

9.      Defendant Adtelligent Media, LLC is a New York limited liability company with

its principal place of business at 92 Broadway, Suite 4, Amityville, New York 11701.

## FACTUAL ALLEGATIONS

### A.      Affluent Ads Works in a Highly Competitive Industry and Guards Its Trade Secrets.

10.      Affluent Ads is an online marketing and lead generation company, which runs

highly targeted advertising campaigns for its clients ("Clients") across multiple online channels.

Affluent Ads also generates customer leads for its clients using proprietary technology and

processes.

11.      Affluent Ads' Clients, also known as "Advertisers," are companies who seek to

use Internet advertising to help their goods and services.  Some of the key industries of the

Clients that rely upon Affluent Ads include financial institutions focusing on mortgage

refinancing and other loans, auto insurance companies, and providers of solar energy and

consumer goods, located throughout the United States of America and also, in some cases, in the

United Kingdom and elsewhere around the world.

12.      Of most relevance to this action is how Affluent Ads develops business and

services Clients through its  LPN Network ("LPN"), the division run by Caputo and Lynch until

4

their employment termination.  Through LPN, Affluent Ads' Clients contract with the Company

to drive consumers who the Clients hope to convert into customers to Client websites and

customer service representatives in order to increase the likelihood that they will purchase Client

goods or services.  For example, an auto insurance company will rely upon Affluent Ads to help

it locate potential customers in a geographic area and income range.  These Clients rely upon

Affluent Ads because of its reputation for identifying high quality consumers most likely to

present the Client with opportunities to  generate new business, its reputation for being able to

get such consumers to Clients' sites and customer service representatives, and its reputation for

doing so through ethical business practices.

       13.     In order to service its Clients, Affluent Ads' LPN division relies upon and

contracts with partners, known as Publishers or Affiliates, who specialize in directing on-line

consumers to Clients to buy their goods and services.  Some of LPN's Publishers are owners and

operators of websites and other electronic mediums offering online media space for ad

placement; the remainder are adept media buyers who are skilled at identifying online media

space opportunities and placing ads to successfully direct business to Clients.  LPN provides its

network of advertising campaigns from various Clients for the Publisher to choose from, and

compensates the Publisher based on the customer traffic its Clients gain from the Publisher's

efforts.  Using the auto insurance example, LPN, on behalf of the auto insurance client, would

turn to its Publisher network to use their expertise in directing new potential customers to the

Client to increase the chance that potential customers purchase auto insurance from the Client,

and Publishers would then be compensated by LPN based on their ability to drive traffic to

LPN's Client.

14.     In addition to its LPN division, Affluent Ads has a lead generation division, which works directly with Clients and lead aggregators to provide clients with high-quality, pre-qualified leads at auction through its dynamic bidding platform.  Affluent Ads' lead generation business builds and operates websites to help consumers find quotes for goods and services offered by its Clients (such as auto insurance, mortgage refinancing, solar panels, and consumer goods);  the Company has consumers complete an online form about their specific consumer needs, and then matches the consumer and his or her needs with one or more  Clients offering the desired good or service.  The Clients, in turn,  pay Affluent Ads for matching them with the consumer, as a potential customer.

15.     The online affiliate marketing industry is extremely competitive, particularly concerning the knowledge of and relationships with Clients and the Publishers skilled at driving on-line consumers to Clients.  Affluent Ads' development of its Publisher network, and the terms of its relationships with specific Publishers, have come at a tremendous investment of money and resources.  Unfortunately, in the online affiliate marketing industry, there are numerous Publishers who generate fraudulent traffic by, among other means, artificially manufacturing facially high consumer traffic by relying on automated programs that give the appearance of high human traffic (known as "bots") or manually clicking on a Client site repeatedly.  In addition, there are Publishers who are not effective at targeting consumers based on specific Client needs. The use of Publishers generating fraudulent traffic and Publishers who are ineffective, result in unsuccessful marketing campaigns for Clients.  Consequently, relationships with Publishers that produce successful marketing campaigns are closely guarded secrets as highly sensitive competitive information. In the industry, when Publishers direct "bad" traffic to Clients, Clients will not pay for such traffic.  While a certain level of bad traffic for which no compensation is

6

given is accepted (this is referred to as "scrubbed" traffic), high levels will result in Client loss of confidence in Affluent Ads which will cause Clients to look elsewhere for their online marketing needs. The identity, contact information, and other details of an industry member's working relationship with Publishers is not available through websites, public resources such as government records, or other means. Affluent Ads, through its industry experience and investment in resources, has developed relationships with Publishers and come to learn which of these Publishers can be relied upon for effective and ethical business, which in turn has allowed Affluent Ads' Clients to rely upon it to provide highly successful marketing support. This knowledge of Publisher identity, information, and quality is a pivotal trade secret, not disclosed to third-parties or even those without a need to know within the Company, and gives Affluent Ads a decided competitive advantage over its competition.

16.     In addition, Affluent Ads' contractual terms with its Publishers, including pricing, margin, and payment frequency information, are closely kept trade secrets. As Publishers are independent agents, online marketing companies retain Publishers only through providing competitive compensation. A Publisher is compensated by the quantity of customers visiting a website that take some form of action towards becoming a customer of the Client. The actions by a customer for which compensation can be earned range from viewing an ad all the way to purchasing a good or service from a Client. If a competitor were to know Affluent Ads' contract terms with Publishers, including pricing information, they could use that knowledge to calculate Affluent Ads' profit margin and undercut Affluent Ads' terms. Affluent Ads could not likely continue as a successful company if its Publisher relationships and pricing information could just be usurped by a competitor.

17.     Similarly, Affluent Ads has invested significant amount of money and resources in developing Client lists and relationships with Clients such that it understands their specifications, has earned their trust, and can most effectively provide for their online marketing needs.  Affluent Ads' Client relationships and the contractual terms with Clients are highly confidential trade secrets that are not publicly available.  The Company's pricing terms with its Clients is highly competitive information which, particularly in conjunction with the terms negotiated with its Publishers, determine the profitability of Affluent Ads.  As with its Publishers, Affluent Ads could not likely continue as a successful company if its Client relationships and pricing information could just be usurped by a competitor.  Moreover, Affluent Ads' viability would be greatly harmed if competitors could simply trade off the good will its high quality services have generated with Clients by representing their services as the Company's.

18.     Befitting their senior level, the Individual Defendants also had deep knowledge of and access to Affluent Ads' strategic business information.  The Individual Defendants were two of approximately five Affluent Ads leaders who attended weekly management meetings where high level and confidential information would be discussed.  Specifically, at these leadership meetings, the Individual Defendants and others would gain understanding as to what strategic efforts are effective (and, just as importantly, what are not effective and why they are not effective), the evaluation of certain Publishers and why certain of them are integral to the success of the Company, and the evaluation of key Clients and strategic ways to strengthen those relationships.  In addition, the Individual Defendants knew Affluent Ads' macro-level strategic information, including where and why investments of resources were made (whether that be by business unit, industry vertical or otherwise), the effectiveness of such investments,  and which

8

industries Affluent Ads believed there to be growth opportunities and how the Company would go about seizing that opportunity.

19.     In support of its business, Affluent Ads has invested millions of dollars and thousands of hours of time developing Client and Publisher relationships and knowledge, proprietary technology, and proprietary know-how.

20.     Due to the competitive nature of the business and the considerable effort and expense devoted by Affluent Ads to developing its trade secrets and confidential information, Affluent Ads takes appropriate steps to protect its trade secrets and confidential information from unauthorized disclosure by restricting access to employees who have a legitimate need for the information.

21.     Affluent Ads requires all employees to enter into agreements the same as or similar to the Non-Compete Agreement that the Individual Defendants signed as a condition of their employment.  These forms of agreement have strong non-disclosure prohibitions and contain post-employment restrictive covenants intended to preserve trade secrets and confidential information, including the good will and relationships, that Affluent Ads has developed.

22.     Affluent Ads also has in place clear policies, including its Communication and Technology Use Policy, to protect its trade secrets and confidential information and to limit access to its computers and property for authorized purposes only.  For example, Affluent Ads' employees and contractors must login to Affluent Ads' secure computer network using unique login credentials.

23.     As part of the employee log-in process for email and internal dashboard access,[1] Affluent Ads requires Google Authenticator two-step verification.  This means, when logging

---

[1]     Dashboards are where authorized Affluent Ads' employees can access sensitive information, such as revenue reporting, tracked Client information and performance, and Publisher information and performance.

9

into a new device for the first time to access email or an internal dashboard, the user not only has to enter the accurate and restricted password but must also enter a randomized series of numbers sent via text to a pre-assigned cell phone for the user before access is granted.

24.     Affluent Ads also restricts access to its Client and Publisher information to the employees who need access to such information to perform their job duties, and not all employees in the Company can access such information.  For dashboard access, Affluent Ads restricts within the Company to the information contained therein to operations and business development employees who need the access to perform their job duties and who make up no more than 20% of Affluent Ads' workforce.  Affluent Ads imposes such internal restrictions because of the sensitivity of the information.

25.     In addition, most employee work computers are Apple manufactured, with File Vault II installed.  This means that if a work computer is stolen or misplaced, nobody can access the files on the computer unless then enter a 16 digit recovery key code or know the individualized password for that particular computer.  Indicative of the efforts taken by Affluent Ads to protect its information, this is the same encryption tools used by NASA to protect its sensitive information.

26.     Affluent Ads' offices are restricted such that third-parties cannot simply enter and gain access to the office, let alone the Company's business information.

27.     In addition, Affluent Ads does not disclose Client or Publisher information to other actual or prospective Clients or Publishers.  Even were a significant Client to insist on knowing the identity of Affluent Ads' Publishers, the Company would not consider providing the identity, let alone any other confidential information regarding that relationship.

28.     If a competitor were to know Affluent Ads' Client and Publisher relationships, as well as the contractual terms of those relationships, including the terms of compensation and the effectiveness of certain Publishers, it would have a substantial and unfair advantage when obtaining work from and providing services to Clients, with the ability, among other things, to undercut Affluent Ads business in the marketplace.

**B.  Lynch and Caputo Join Affluent Ads in a Senior Managerial Capacity, Reporting Directly to the CEO, and Enter Into Non-Compete Agreements**

29.     Affluent Ads hired Lynch and Caputo as employees on or about June 4, 2013.  At hire, both Lynch and Caputo held the position of Co-Director for Partner Network Operations, reporting directly to Zachary Robbins ("Robbins"), Affluent Ads' Chief Executive Officer.[2]  In that capacity, they ran LPN, a multi-million dollar business unit, and managed several employees.

30.     Affluent Ads explicitly informed the Individual Defendants of their obligations to the Company upon hire and required them to enter into contractual agreements to protect Company trade secrets and confidential information.  The Offer Letter made clear that, except for limited wind-down work for a prior company that is unrelated to the facts giving rise to this action, "[t]his is a full time position.  During the period of employment hereunder…you shall devote your full business time, ability and attention to the business of the Company, and you shall not engage in or perform duties for any other person that interfere with the performance of your duties hereunder."  The Offer Letter further provided that employment was contingent upon the Individual Defendants' execution of the restrictive covenant agreement that was enclosed

---

[2]      In May 2015, Caputo's title changed to Vice-President, Sales and Distribution, for LPN and Lynch's changed to Vice-President, Business Development and Operations, for LPN, but their material duties and overall responsibility for LPN remained the same throughout their employment.

11

with the Offer Letter.  Both Lynch and Caputo agreed to the terms of employment, signing the

Offer Letter.

31.     Lynch and Caputo also signed their respective Non-Compete Agreements, which

were enclosed with the Offer Letter, and which contained non-disclosure, non-solicit, and non-

competition obligations.  By entering into the Non-Compete Agreement, Lynch and Caputo

agreed:

a.   Not to "disclose any Confidential Information to any person or entity other than

employees of Company or other persons providing services to Company or use the same for any

purposes (other than in the performance of his/her duties providing services to Company)

without written approval by an officer of Company, either while performing services on behalf

of Company or at any time thereafter."  (The Non-Compete Agreement, § 1.1);

b.   Not to contact or communicate with Clients for "[a]s long as he is rendering

services to Company and for a period of one (1) year thereafter…with the purpose or effect of (i)

interfering with Company's relationship with or sales of any products or services to such

customer or Advertiser or (ii) providing, selling, or attempting to sell any products or services

from an entity or person other than Company, where such products or services are of the type

offered for sale or provided by Company while Employee was employed by Company and

specifically including (a) providing, selling, or attempting to provide or sell Leads for any

industry that Company purchased or sold Leads during the above-mentioned restriction period

(such as, but not limited to short-term consumer loan, payday loan, and auto-insurance

industries), (b) providing or selling Internet Traffic or driving Internet users to web pages

PHIL1 5572240

specified by such [Client], and (c) selling advertising inventory space or Internet traffic to any such [Client]…" (Id., § 3.2);[3]

    c.  Not to contact or communicate with Publishers for "[a]s long as he is rendering services to Company and for a period of one (1) year thereafter…with the purpose or effect of (i) purchasing online media, advertising space, Internet Traffic, or Leads from such Publisher, (ii) promoting through any online means advertisements, products or services through such Publisher, (iii) compensating such Publisher for online advertising services, or (iv) interfering with Company's relationship with such Publisher or inducing or causing such Publisher to terminate or reduce his/her/its relationship with Company…" (Id., § 3.3);[4]

    d.  Not to solicit suppliers during employment or for a one year period therafter (Id., § 3.4);

    e.  Not to solicit employees during employment or for a two year period therafter (Id., § 3.5);

    f.  Not to participate for "as long as he is rendering services to Company and for a period of six (6) months thereafter…in any…business or entity that….(a) engages in affiliate marketing, where Internet Traffic is purchased or generated, such as but not limited to through websites, emails, or by displaying online advertisements, in a manner designed to sell it to a particular third-party, with compensation based on performance…, or (b) engage in conduct in preparation of providing any of the products or services specified in (a) during the restricted period…" (Id., § 4.1); and

    g.  Not to compete with Affluent Ads for a one-year period in any area of the business besides the six-month restriction described in Section 3.6.  (Id., § 4.2).

---

[3]    The temporal restriction for (ii) in Section 3.2 is limited to six months under certain circumstances.
[4]    The temporal restriction for (ii) in Section 3.3 is limited to six months under certain circumstances.

13

32.     Caputo and Lynch shared responsibilities for running Affluent Ads' LPN division.  As Lynch explains on his LinkedIn page, the Individual Defendants' job duties included:

a.   Responsibility for [LPN] P&L, operations and business initiatives between both publishers and advertisers;

b.   Ensure maximum ROI [return on investment] for both publishers and advertisers by identifying profitable streams of revenue while diversifying the company's portfolio into new verticals;

c.   Manage the overall strategy, business development team and key publisher relationships for [LPN] which consists of almost 50 advertiser verticals across more than two thousand publisher partners.[5]

33.     In connection with these significant responsibilities, Caputo and Lynch had exposure to Affluent Ads' most valuable trade secrets and confidential information, including its assessment of specific Publisher and Client relationships, key contacts at Publishers and Clients, and the contractual and economic terms of Affluent Ads' relationships with Publishers and Clients.  Indeed, a significant part of the Individual Defendants' job responsibilities consisted in negotiating agreements with Publishers and Clients, strengthening Affluent Ads' pre-existing relationships, and identifying new business opportunities for LPN.

34.     For performing these job duties, the Individual Defendants were highly compensated by Affluent Ads.

---

[5]     While more circumspect in his description of responsibilities, Caputo also identifies in his LinkedIn profile that he was "[r]esponsible for [LPN] P&L, operations, and business initiatives between both publishers & advertisers."  True and correct copies of Lynch's and Caputo's LinkedIn profiles, last viewed on July 18, 2016, are attached hereto at Exhibits 3 and 4.

**C.     Defendants Conspired to Form a Company to
        Compete with Affluent Ads in the Winter of 2014 and 2015**

35.    Upon information and belief, and unbeknownst to Affluent Ads at the time, in or about November 2014, Caputo and Lynch entered into an agreement to form a new business that would compete directly with Affluent Ads while they remained wage-earning employees of the Company.

36.    On November 24, 2014, Caputo wrote to Lynch:  "adtelligent[,] but yes[,] I am down[,] and I know[,] thats the best thing for us[,] the timeline we discussed[,] please don't say anything stupid[.]"

37.    On or about February 5, 2015, in furtherance of their agreement to knowingly, unlawfully compete, Caputo and Lynch formed Defendant Adtelligent Media, LLC.  The business address it registered with the New York Department of State is 92 Broadway, Suite 4, Amityville, New York  11701, the publicly identified business address for the Ansanelli Law Group, where one or more of Caputo's relatives practice law.  The New York Department of State, Division of Corporations' Entity Information also identifies Lynch on the address information for Adtelligent.

38.    Upon information and belief, Defendants conducted business in unlawful competition with Affluent Ads using the names 925Media and/or Blue Mule, or by just performing competitive activities as individuals without the use of any business name or entity structure..

39.    In furtherance of their agreement to unlawfully compete, Caputo and Lynch set up a bank account with JP Morgan Chase & Co. ("Chase"), which is the same banking institution used by Affluent Ads.  The bank account number for this account is #[XXXXX]1802 (the "Chase Account").  Upon information and belief, the Individual Defendants chose to bank with

Chase for the purpose of leading Affluent Ads' Clients to believe that the new account was an Affluent Ads' account to which some payments should be directed and, by choosing the same banking institution that Affluent Ads had previously provided to Clients for payment purposes, this false story would be considered more plausible by unsuspecting Clients.

40.    Upon information and belief, starting in November 2014 and continuing to present, the Individual Defendants used Adtelligent to perform work for Clients for their own benefit and not on behalf of Affluent Ads. Caputo and Lynch did not inform Affluent Ads of the business opportunities they took for their own benefit. Caputo and Lynch performed this work for their own benefit while they remained active, paid employees of Affluent Ads.

41.    Upon information and belief, beginning in November 2014 and continuing to present, Caputo and Lynch entered into an agreement to misappropriate Affluent Ads' trade secrets, confidential information, good will, property and resources for their own benefit. Upon information and belief, Caputo and Lynch concluded that it would be substantially cheaper and easier for Adtelligent to succeed if they took Affluent Ads property, resources, and relationships for their own benefit, instead of having to invest the time and resources to develop Client and Publisher relationships, business documents, pricing models, and strategic plans of their own for Adtelligent. At the time that the Individual Defendants agreed to take Affluent Ads' property, resources and relationships, including its trade secrets, confidential information, and good will, they knew that they did not have authority to access or use this information, resources, and material for their own benefit. The Individual Defendants never disclosed to Affluent Ads their purpose for accessing or taking these items because they knew that Affluent Ads would not authorize such access or use.

16

42.     For example, upon information and belief, Caputo and Lynch used the Company's computers that they were authorized to use for legitimate Affluent Ads business purposes to instead develop and run Adtelligent's business. The Individual Defendants did not have authority to use these computers for the purpose of using Affluent Ads confidential information, trade secrets, and good will for their own benefit.  The Individual Defendants also did not have authority to use these computers for the purpose of creating or editing Adtelligent documents, yet – despite this lack of authority – had a folder on their Affluent Ads' work computers dedicated to Adtelligent business.

43.     Upon information and belief, Defendants used Affluent Ads' own campaign tracking platform, Cake (www.getcake.com), as well as several third-party tracking platforms, including among others, HasOffers (www.hasoffers.com) and Limelight (https://www.limelightcrm.com), to support their unlawful scheme.  Defendants appear to have used Cake, HasOffers, Limelight, and/or other tracking platforms to track  Publisher and Advertiser business activity for their own benefit, rather than for the benefit of Affluent Ads.

44.     In addition to marketing themselves to Clients as Adtelligent, upon information and belief, the Individual Defendants also directed Affluent Ads' Clients to send payments intended for Affluent Ads to Adtelligent's Chase Account.  As this part of their scheme, upon information and belief, the Individual Defendants would inaccurately cause Affluent Ads' records to identify approximately 10% of the work generated for certain Clients as "scrubbed" traffic, i.e., not traffic chargeable to the Clients because it was bad customer traffic for one or more reasons -- such as because it was fraudulent traffic (for example, automated click traffic caused by bots or by multiple manual clicks by one individual from the same IP address, intended to exaggerate customer flow) or was mismatched traffic (for example, a mortgage

17

refinance customer who, as it turns out, does not own a home), etc. -- and then have Clients send

payment for that 10% "scrubbed" (bad) traffic to their Adtelligent Chase Account.  In reality, the

10% scrubbed traffic was fully chargeable and, in fact, was charged to the Clients, who paid the

amount into Defendants' Chase Account with the mistaken understanding that it was being sent

to an Affluent Ads bank account.  As the Individual Defendants explained in a March 20, 2015

communication:

> Lynch:  the scrub on reverse[] doesn't work[] unless they do volume
> Caputo:  sure
> Lynch:  you can't scrub 5 leads
> Caputo:  true[,] got it[,] gotta see whats up w this shit
> **Lynch:  its got to be like 100 – then 10 would be scrubbed...maybe**
> Caputo:  got it[,] call now we got
> **Lynch:  its one out of 10 leads[] at 10 percent[,] number - #[XXXX]1802[,] all the other info he has is still accurate – he just needs to switch the acct number out**
> Caputo:  I shouldn't give him the new address?
> Lynch:  nah[,] its fine
> Caputo:  ok
> **Lynch:  all it needs is bank acct[] and routing which he has[,] its literally just a switch of the acct number and all good**
> **Caputo: kk cool[,] Ill get that done[.]**

45.     Upon information and belief, Defendants' unlawful scheme was not limited to

competing unlawfully through Adtelligent or by diverting payments intended for Affluent Ads

into their Chase Account.  Although its investigation is ongoing and the Individual Defendants

have refused to disclose the scope of their malfeasance, Affluent Ads understands that the

Individual Defendants also competed directly as individuals and generated sales for their own

benefit without using Adtelligent.  Based on this understanding, the Individual Defendants have

retained additional payments, not reflected in Adtelligent's accounts or records, that should have

been directed to Affluent Ads as well.

46.     Defendants' unlawful scheme to simultaneously compete against Affluent Ads

and divert payments intended for the Company into their Chase Account or other accounts under

their control has caused, and continues to this day to cause irreparable harm to the Company, and violates their legal obligations.

### D. Affluent Ads Becomes Aware of Defendants' Misappropriation and Unlawful Competition When Investigating a Sudden Steep Decline in Revenue and Loss of Key Clients in LPN

47.     While Defendants appear to have been operating their unlawful scheme since at least November 2014, Affluent Ads only recently became aware of their actions.

48.     In response to steep revenue decline and sudden loss of several large Clients in the LPN business over a short period of time in May and June 2016, Robbins requested that Caputo and Lynch provide explanations for the business loss.  When their explanations did not withstand scrutiny, Robbins directed them to provide more detailed pipeline reports so that he could undertake a closer review of the LPN business.

49.     When the pipeline reports did not provide clarity on the sudden revenue decline or Client loss, on or about June 27th, 2016 Robbins commenced an investigation to better understand what they were doing with their time.  It was only through this investigation over the course of several days ending on July 1st, 2016,  that Robbins and Affluent Ads first became aware of an entity called "Adtelligent" and that the Individual Defendants' were directly competing with their employer and had set up one or more separate bank accounts for such purposes.

50.     Upon this discovery, Affluent Ads continued its investigation into the Individual Defendants, and learned that this scheme had been taking place for several years, including the process of taking the revenue for "one out of every ten" sales generated by LPN for themselves.

51.     Although its investigation is ongoing and cannot be completed without expedited discovery being sought in connection with its Motion for a Temporary Restraining Order and

Preliminary Injunction, Affluent Ads understands that in one month alone, in just one of the Company's many Client industries (mortgage refinance) Defendants generated over $42,000 in revenue from two key Company Clients by unfairly competing with the Company through Adtelligent. In addition to this unlawful competition, accepting Defendants' own plan of pocketing the revenue from "one out of every ten" sales generated by LPN for themselves, even if that pocketing of revenue earned by LPN was limited to a few key Clients, Defendants would still have taken several hundred thousand dollars of additional LPN revenue from Affluent Ads.

52.    Providing insight into Defendants' conduct and misrepresentations, a Client recently asked about payments made to Defendants' Chase Bank Account explained that the Individual Defendants had represented that "Adtelligent" was another name used by Affluent Ads to do business, and hence any money the Client sent to Adtelligent's Chase Account was going to Affluent Ads, thus deceiving a Client as well as Affluent Ads.

**E. Affluent Ads Gave Defendants an Opportunity To Explain and Defend Their Actions But Received No Bona Fide Response, and Terminated Their Employment**

53.    On July 14, 2016, while still employed by the Company, Caputo and Lynch met with Robbins, Affluent Ads Co-Founder Stephen Gill ("Gill"), Affluent Ads' general counsel, and Affluent Ads' outside counsel regarding Affluent Ads' investigation into their conduct as of that date.

54.    Affluent Ads gave Caputo and Lynch an opportunity to explain their actions and take steps to remedy the damage they have caused.

55.    Caputo and Lynch refused to provide the Company with any information related to their misconduct, nor did they offer any explanation.

56.    Instead, Caputo and Lynch ended the meeting with vague representations that the Company would be hearing from them or their legal counsel in connection with this matter. To

date, neither the Company nor its legal counsel have received further communications from any

of the Defendants or those acting on their behalf.

57.     At the July 14 meeting, Affluent Ads terminated Caputo's and Lynch's

employment.  Affluent Ads also took possession of Caputo's and Lynch's Affluent Ads' work

computers, which are currently undergoing additional analysis for the purpose of further

uncovering the scope of their unlawful action.

58.     Upon information and belief, without the benefit of injunctive relief, the

Individual Defendants are to this day continuing to operate Adtelligent, relying upon and

misappropriating Affluent Ads' confidential information, good will, and trade secrets, and

flouting their contractual and common law obligations to the Company.  This continued unlawful

conduct includes, upon information and belief, communicating with Affluent Ads' Clients and

Publishers for the benefit of Defendants.  Indeed, their silence in response to being confronted by

their actions strongly suggests they are using this time to continue their unlawful business

schemes, or  to destroy evidence of such schemes, rather than to meaningfully engage Affluent

Ads regarding  their actions and steps they must take to attempt to rectify those actions.  Absent

immediate injunctive relief, Affluent Ads will continue to suffer irreparable harm through

Defendants' actions.

## COUNT I
## MISAPPROPRIATION OF TRADE SECRETS – 18 U.S.C. § 1832
### (as to all Defendants)

59.     Paragraphs 1 through 58 are incorporated by reference as if fully set forth herein.

60.     Defendants have misappropriated Affluent Ads' trade secrets and confidential

information without the express or implied consent of Affluent Ads.

PHIL1 5572240

61.     Lynch and Caputo, while managerial employees of Affluent Ads, accessed and relied upon Company Publisher and Client information to be used for the benefit of Defendants. Upon information and belief, among other things Lynch and Caputo relied upon Affluent Ads' Publisher and Client relationships, pricing information, margin information, good will, and knowledge of Publisher quality to engage in the aforementioned unlawful conduct.

62.     Caputo and Lynch also have knowledge of competitive pricing information and other trade secrets and confidential information which they have used or disclosed, or are likely to use or disclose, in performing their duties for Adtelligent, as this was some of the very information for which they had responsibility as the management team running LPN.

63.     Affluent Ads has expended substantial resources in developing its trade secrets and confidential information for its exclusive use and benefit. Affluent Ads' trade secrets and confidential information derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by any third parties.

64.     Affluent Ads does not disclose its trade secrets or confidential information to its competitors and has made reasonable efforts to protect their confidentiality.

65.     Affluent Ads communicated its trade secrets and confidential information to Caputo and Lynch in confidence and Caputo and Lynch knew that Affluent Ads intended for its trade secrets to remain confidential.

66.     Adtelligent knew that Caputo and Lynch were not authorized by Affluent Ads to use trade secrets and confidential information for the benefit of Defendants.

67.     Defendants have used Affluent Ads' trade secrets and confidential information to compete with Affluent Ads and are continuing to do so.

68.     As a direct and proximate result of Defendants' misappropriation of trade secrets, Affluent Ads will continue to suffer irreparable harm.

69.     As a direct and proximate result of Defendants' misappropriation of trade secrets, Affluent Ads has suffered, and will continue to suffer substantial damages absent Court intervention, the precise amount of which will be determined at trial.

70.     Defendants' conduct has been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

**COUNT II**
**MISAPPROPRIATION OF TRADE SECRETS - 12 Pa.C.S.A. § 5302**
**(as to all Defendants)**

71.     Paragraphs 1 through 70 are incorporated by reference as if fully set forth herein.

72.     Defendants have misappropriated Affluent Ads' trade secrets and confidential information without the express or implied consent of Affluent Ads.

73.     Lynch and Caputo, while managerial employees of Affluent Ads, accessed, relied upon, and used Company Publisher and Client information for the benefit of Defendants.  Upon information and belief, among other things Lynch and Caputo relied upon Affluent Ads' Publisher and Client relationships, pricing information, margin information, and knowledge of Publisher quality to engage in the aforementioned unlawful conduct.

74.     Caputo and Lynch also have knowledge of competitive pricing information and other trade secrets and confidential information that they have used or disclosed, or are likely to use or disclose, in performing their duties for Adtelligent, as this was some of the very information for which they had responsibility for as the heads of LPN.

75.     Affluent Ads has expended substantial resources in developing its trade secrets and confidential information for its exclusive benefit. Affluent Ads' trade secrets and

23

confidential information derive economic value from the fact that they are neither generally known nor readily ascertainable by proper means by any third parties.

76.    Affluent Ads does not disclose its trade secrets or confidential information to its competitors and has made reasonable efforts to protect their confidentiality.

77.    Affluent Ads communicated its trade secrets and confidential information to Caputo and Lynch in confidence and Caputo and Lynch knew that Affluent Ads intended for its trade secrets to remain confidential.

78.    Adtelligent knew that Caputo and Lynch were not authorized by Affluent Ads to use trade secrets and confidential information for the benefit of Defendants.

79.    Defendants have used Affluent Ads' trade secrets and confidential information to compete with Affluent Ads and are continuing to do so.

80.    As a direct and proximate result of Defendants' misappropriation of trade secrets, Affluent Ads will continue to suffer irreparable harm.

81.    As a direct and proximate result of Defendants' misappropriation of trade secrets, Affluent Ads has suffered and will continue to suffer substantial damages absent Court intervention, the precise amount of which will be determined at trial.

82.    Defendants' conduct has been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

PHIL1 5572240

## COUNT III
## BREACH OF CONTRACT
### (as to Caputo)

83.    Paragraphs 1 through 82 are incorporated by reference as if fully set forth herein.

84.    Caputo is bound by the terms of his Non-Compete Agreement, which he entered into as a condition of his employment with Affluent Ads.

85.    The Non-Compete Agreement requires that Caputo not disclose Affluent Ads' trade secrets and confidential information and not use such trade secrets and confidential information for the benefit of any person or entity other than Affluent Ads.  Through his actions as described above, Caputo has breached his non-disclosure obligations and, upon information and belief, continues to do so to this day absent relief from the Court.

86.    The Non-Compete Agreement requires Caputo, during his employment with Affluent Ads and for a period thereafter, not to solicit any Clients or Publishers of Affluent Ads. Through his actions as described above, Caputo has breached his non-solicitation obligations and, upon information and belief, continues to do so to this day absent relief from the Court.

87.    The Non-Compete Agreement requires Caputo, during his employment with Affluent Ads and for a period thereafter, not to engage in certain competitive activity with Affluent Ads.  Through his actions as described above, Caputo has breached his non-competition obligations and, upon information and belief, continues to do so to this day absent relief from the Court.

88.    As a direct and proximate result of Caputo's breach, Affluent Ads has suffered substantial damages, and will continue to suffer substantial damages, absent Court intervention.

89.    Caputo's actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

## COUNT IV
## BREACH OF CONTRACT
### (as to Lynch)

90.     Paragraphs 1 through 89 are incorporated by reference as if fully set forth herein.

91.     Lynch is bound by the terms of his Non-Compete Agreement, which he entered into as a condition of his employment with Affluent Ads.

92.     The Non-Compete Agreement requires that Lynch not disclose Affluent Ads' trade secrets and confidential information and not use such trade secrets and confidential information for the benefit of any person or entity other than Affluent Ads.  Through his actions as described above, Lynch has breached his non-disclosure obligations and, upon information and belief, continues to do so to this day absent relief from the Court.

93.     The Non-Compete Agreement requires Lynch, during his employment with Affluent Ads and for a period thereafter, not to solicit any Clients or Publishers of Affluent Ads. Through his actions as described above, Lynch has breached his non-solicitation obligations and, upon information and belief, continues to do so to this day absent relief from the Court.

94.     The Non-Compete Agreement requires Lynch, during his employment with Affluent Ads and for a period thereafter, not to engage in any competitive activity with Affluent Ads.  Through his actions as described above, Lynch has breached his non-competition obligations and, upon information and belief, continues to do so to this day absent relief from the Court.

95.     As a direct and proximate result of Lynch's breach, Affluent Ads has suffered substantial damages, and will continue to suffer substantial damages, absent Court intervention.

96.     Lynch's actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

26

PHIL1 5572240

## COUNT V
## BREACH OF FIDUCIARY DUTY
### (as to Caputo and Lynch)

97.     Paragraphs 1 through 96 are incorporated by reference as if set forth fully therein.

98.     At all times prior to their employment terminations, Caputo and Lynch were employees and agents of Affluent Ads.

99.     As agents of Affluent Ads, running a division for the Company, Caputo and Lynch owed Affluent Ads a fiduciary duty.

100.    Caputo and Lynch, through their actions as set forth herein, intentionally and willfully violated their fiduciary duties to Affluent Ads by taking actions against Affluent Ads' interest while employed by Affluent Ads.

101.    As a direct and proximate result of Caputo's and Lynch's acts and omissions, Affluent Ads has suffered substantial damages and will continue to suffer substantial damages, absent Court intervention.

102.    Caputo's and Lynch's actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

## COUNT VI
## BREACH OF DUTY OF LOYALTY
### (as to Caputo and Lynch)

103.    Paragraphs 1 through 102 are incorporated by reference as if set forth fully therein.

104.    At all times prior to their employment termination, Caputo and Lynch were employees and agents of Affluent Ads.

105.    As agents of Affluent Ads, running a division for the Company, Caputo and Lynch owed Affluent Ads a duty of loyalty.

27

106.     Caputo and Lynch, through their actions as set forth herein, intentionally and willfully violated their duties of loyalty to Affluent Ads by taking actions directly and undeniably contrary to Affluent Ads' interests while employed by Affluent Ads.

107.     As a direct and proximate result of Caputo's and Lynch's acts and omissions, Affluent Ads has suffered substantial damages.

108.     Caputo's and Lynch's actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

### COUNT VII
### CONVERSION
### (as to all Defendants)

109.     Paragraphs 1 through 108 are incorporated by reference as if set forth fully therein.

110.     At all times, Affluent Ads retained all right, title, and interest in the money, trade secrets and other information taken by Defendants.

111.     Defendants knowingly, dishonestly, and intentionally took and retained Affluent Ads' money, trade secrets and other information without authorization.

112.     Defendants' acts constitute a knowing, unlawful and intentional conversion of trade secrets and information for Defendants' economic benefit and to the economic detriment of Affluent Ads.

113.     Defendants have refused Affluent Ads's demands to return the money, trade secrets, and other Affluent Ads property that Caputo and Lynch illegitimately took.

114.     As a direct and proximate result of this conversion, Affluent Ads has suffered substantial damages and will continue to suffer substantial damages absent Court intervention.

28

115.    Defendants' actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

## COUNT VIII
## UNJUST ENRICHMENT
### (as to all Defendants)

116.    Paragraphs 1 through 115 are incorporated by reference as if set forth fully therein.

117.    Through their misappropriation of trade secrets and confidential information and taking of payments intended for Affluent Ads, Defendants received a benefit from Affluent Ads, i.e., Affluent Ads' property, to which Defendants were not entitled.

118.    Defendants have improperly, and without consent by Affluent Ads, retained this Affluent Ads' property.

119.    Defendants had, and have, no legitimate entitlement to this Affluent Ads' property.

120.    Upon information and belief, Defendants have continued to use the ill-gotten property for their own benefit.

121.    Defendants have refused Affluent Ads' demands to return the money, trade secrets, confidential information, and other Affluent Ads' property that Caputo, Lynch, and Adtelligent illegitimately took.

122.    The taking and retention of this benefit is both inequitable and unjust.

123.    As a direct and proximate result of Defendants' unjust enrichment, Affluent Ads has suffered substantial damages and will continue to suffer substantial damages absent Court intervention.

124.   Defendants' actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

## COUNT IX
## UNFAIR COMPETITION
### (as to all Defendants)

125.   Paragraphs 1 through 124 are incorporated by reference as if set forth fully therein.

126.   By virtue of the acts described above, Defendants have misappropriated trade secrets and confidential information of Affluent Ads, and have employed unfair and deceptive practices intended to interfere with Affluent Ads' ability to fairly compete with Defendants.

127.   Defendants have committed these acts maliciously and for the sole purpose of inflicting harm on Affluent Ads or to benefit themselves at the expense of the Company.

128.   As a direct and proximate result of Defendants' unfair competition, Affluent Ads has suffered substantial damages and will continue to suffer substantial damages absent Court intervention.

129.   Defendants' actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

## COUNT X
## TORTIOUS INTERFERENCE WITH CONTRACTUAL RELATIONS
### (as to all Defendants)

130.   Paragraphs 1 through 129 are incorporated by reference as if set forth fully therein.

131.   Affluent Ads has valid and binding agreements with its Clients and its Publishers, which provided that Affluent Ads would provide certain contractual services for Clients, and

would receive certain contractual services from Publishers, in connection with Affluent Ads' online marketing efforts.

132.    Defendants knew about these binding agreements with Affluent Ads' Clients and Publishers as part of the Individual Defendants' key job responsibilities which included negotiating such agreements.

133.    Despite Defendants' actual knowledge of these agreements, upon information and belief, Defendants intentionally encouraged Affluent Ads' Clients and Publishers to breach their respective agreements with Affluent Ads by doing business with Defendants instead.

134.    Upon information and belief, Defendants used their knowledge of Affluent Ads' confidential information and trade secrets, including its pricing terms, to undercut its contractual relationships with its Clients and Publishers in order for Defendants to unlawfully gain business.

135.    Defendants thereby wrongfully interfered with Affluent Ads' contractual rights and actual and prospective business relationships, thereby causing damages to Affluent Ads.

136.    Defendants' wrongful actions were not privileged.

137.    Defendants' actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

**COUNT XI**
**CONSPIRACY**
**(as to Caputo and Lynch)**

138.    Paragraphs 1 through 137 are incorporated by reference as if set forth fully therein.

139.    Upon information and belief, the Individual Defendants agreed, combined and acted with a common plan and purpose to misappropriate Affluent Ads's trade secrets and other property by engaging in the unlawful acts described above.

31

140.    Upon information and belief, the Individual Defendants agreed, combined and acted with a common plan to breach Caputo's and Lynch's fiduciary and other common-law duties owed to Affluent Ads by engaging in the unlawful acts described above.

141.    Upon information and belief, the Individual Defendants committed overt acts, as described above, including, but not limited to, the unauthorized taking of trade secrets and confidential information and competing against Affluent Ads while Caputo and Lynch were still employees, in pursuit of the common purpose described above.

142.    As a direct and proximate result of the acts done in furtherance of the conspiracy, Affluent Ads has been damaged, including damages to Affluent Ads' overall business, its loss of payments diverted to Defendants' bank account, and damage in the form of expenses related to investigative and remedial actions taken to address the effects of the conspiracy. Affluent Ads has suffered, and will continue to suffer, these injuries.

143.    As a direct and proximate result of the Individual Defendants' conspiracy, Affluent Ads has suffered substantial damages and will continue to suffer substantial damages absent Court intervention.

144.    The Individual Defendants' actions have been willful and outrageous and undertaken with reckless indifference to the rights of Affluent Ads.

## PRAYER FOR RELIEF

WHEREFORE, Affluent Ads requests the following relief:

(a) Defendants be enjoined, preliminarily until hearing, and thereafter permanently, from using or presenting any of Plaintiff's trade secrets or proprietary and confidential information to any other entity other than Plaintiff.

32

(b) Defendants be enjoined, preliminarily until hearing, and thereafter permanently, from performing services in competition with Plaintiff, whether for their own benefit or on behalf of a competitor of Plaintiff, through Adtelligent, individually, or otherwise, including being enjoined from providing services for or communicating with Plaintiff's former, current, or prospective Clients, providing services or communicating with Plaintiff's former, current, or prospective Publishers, withdrawing from any pending work with Clients, and not attending any trade shows related to Internet marketing.

(c) Defendants be ordered to immediately return to Plaintiff all Company documents and information, with the exception of documents and information pertaining to their personal compensation.

(d) Defendants be ordered to promptly produce copies of all such Company documents during the expedited discovery process related to Plaintiff's Motion for Temporary Restraining Order and Motion for Preliminary Injunction.

(e) Defendants be ordered to respond within five days of service of expedited discovery by Plaintiff regarding subjects such as actions taken in competition with Plaintiff, trade secrets and confidential information of Plaintiff used by Defendants for the benefit of any entity or person other than Plaintiff, steps taken to ensure compliance with their contractual obligations to Plaintiff, and steps taken to ensure non-disclosure or non-misappropriation of Plaintiff's trade secrets and confidential information.

(f) Defendants be enjoined from deleting, destroying, erasing, modifying, or otherwise altering any and all electronic media, including, but not limited to, work and personal email accounts, text messages, Skype logs, instant messages, application-based communications, external

33

hard drives, thumb drives, or other portable media, network drives, computers, cellular phones, smart phones, and personal digital assistants, that have stored Plaintiff's documents or information, or were used to transfer or temporarily store Plaintiff's documents, data, or information, or that referred or related to Plaintiff, Plaintiff's business, Plaintiff's existing or prospective employees, Clients, or Publishers, or work completed to date, until such time that the Court gives them leave to do so.

(g) Defendants be ordered to preserve all documents, data, and information pertaining to actions taken in competition with Plaintiff, whether individually, through Adtelligent, or otherwise, work performed for themselves or any entity other than Plaintiff, communications amongst Defendants, communications among Defendants and/or with other individuals regarding Defendants' performance of any work other than for Plaintiff during or since their employment with Plaintiff, and communications among Defendants and/or with other individuals regarding Defendants' knowledge of and/or access to Plaintiff's trade secrets and confidential information.

(h) Defendants be required to disgorge any and all revenues that they received either directly, or from any business gained, from the use of Affluent Ads' trade secrets and confidential information and/or unlawful competition, while engaging in some or all of the above-stated unlawful activity;

(i) Caputo and Lynch be required to disgorge any and all wages, including bonuses or commissions, that they received from Affluent Ads while in engaging in some or all of the unlawful activity described above (from November 24, 2014 through their date of termination, July 14, 2016).

(j) Affluent Ads be awarded actual, compensatory, exemplary, and punitive damages, and pre-judgment and post-judgment interest;

34

(k) Affluent Ads be awarded all reasonable attorneys' fees, and costs incurred in addressing Defendants' misappropriation of Affluent Ads' trade secret information; and

(l)  Affluent Ads be awarded such other and further necessary and proper relief as the Court may deem just and proper.

Respectfully submitted,

July 21, 2016

/s/ Jonathan S. Krause
Jonathan S. Krause, Esq.
KLEHR HARRISON
HARVEY BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA  19103
ph (215) 569-4496
fax (215) 568-6603
jkrause@klehr.com

Counsel for Plaintiff
Affluent Ads, LLC

PHIL1 5572240

# EXHIBIT 1

**INVENTION, NON-DISCLOSURE, NON-SOLICITATION, AND NON-COMPETITION AGREEMENT**

This is an Agreement, entered into on June 4, 2013, by and between Affluent Ads, LLC (D/B/A Leadnomics) ("Company"), and Jovan Caputo ("Employee").

**Background**

WHEREAS, Employee is employed by Company. The parties wish to set forth certain restrictions concerning confidential information, inventions, and competition.

WHEREAS, the Employee agrees and acknowledges that he would not be entitled to the consideration being provided pursuant to his employment but for his acceptance of the terms and conditions of this Agreement.

WHEREAS, the Employee agrees and acknowledges that he will have access to confidential and non-public business information of the Company in connection with the performance of his duties for the Company, the disclosure of which would irrevocably harm the Company.

NOW, THEREFORE, intending to be legally bound and acknowledging the receipt of adequate consideration, the parties hereby agree and covenant as follows:

1.  **Confidential Information.**

    **1.1**     **In General.** Employee's duties will give him substantial exposure to the Company's operations, technology, business strategy, and other non-public information that is essential to the success of the Company and that provides the Company with a competitive advantage. All information of a private, proprietary or confidential nature concerning Company's or its affiliates' business, business relationships or financial affairs ("Confidential Information"), whether in written, electronic or other form, shall be the exclusive property of Company. Without limiting the foregoing, Confidential Information may include, without limitation, inventions, products, processes, methods, models, algorithms, techniques, formulae, projects, developments, plans, research data, financial data, personnel data, computer programs, source code, other technology, know-how, patent applications, customer and supplier lists, personal or behavioral information relating to Internet users, and identifying information or other facts relating to customers or prospective customers. Employee will not disclose any Confidential Information to any person or entity other than employees of Company or other persons providing services to Company or use the same for any purposes (other than in the performance of his/her duties providing services to Company) without written approval by an officer of Company, either while performing services on behalf of Company or at any time thereafter. Employee agrees and acknowledges that the Company has exercised reasonable efforts to secure its Confidential Information, including, but not limited to, restricting access to them to those Company employees who need to access such information in the performance of their duties for the Company, enacting and enforcing policies regarding the authorized uses for them, and not disclosing them to third-parties. You further agree and acknowledge that the Company's Confidential Information are of value to the Company and were created and maintained at significant expense to the Company.

    **1.2**     **Ownership of Property.** All files, letters, memoranda, reports, records, data, sketches, drawings, notes and all other written or electronic material containing Confidential Information, whether created by Employee or others, which shall come into his custody or possession, shall be and

are the exclusive property of Company to be used by Employee only in the performance of his duties for Company. All such materials or copies thereof and all tangible property of Company in the custody or possession of Employee shall be delivered to Company (or destroyed, at Company's direction), upon the earlier of (i) a request by Company or (ii) termination of Employee's relationship with Company. After such delivery, Employee shall not retain any such materials or copies thereof or any such tangible property.

1.3     **Reasonable Diligence.** Employee shall use reasonable diligence to avoid disclosure or unauthorized use of Confidential Information including, without limitation, retaining Confidential Information in a secure place with access limited to authorized persons and otherwise complying with Company's security policies that are furnished to Employee from time to time. If Employee becomes aware, or reasonably believes, that Confidential Information has been disclosed or used without authorization, Employee shall promptly notify Company and provide all information available concerning such disclosure or unauthorized use.

1.4     **Information and Property of Others.** The obligations of Employee under this section 1 shall apply to confidential information and materials of customers and suppliers of Company and other third parties who may have disclosed or entrusted the same to Company or to Employee.

2.     **Inventions.**

2.1     **Disclosure.** Employee will make full and prompt disclosure to Company of all inventions, improvements, concepts, ideas, software, designs, product developments, works of authorship and other intellectual property, whether patentable or not, which are created, made, conceived or reduced to practice by Employee or under Employee's direction or jointly with others during the period of performing services on behalf of Company, whether or not during normal working hours or on the premises of Company, and which (i) relate to the present or planned business activities of Company, (ii) incorporate, are based upon or derive from Company's Confidential Information, or (iii) were created, made, conceived or reduced to practices in connection with Company's facilities, equipment or other resources ("Developments").

2.2     **Assignment.** Employee hereby assigns, transfers and conveys to Company all of his right, title and interest in and to any and all Developments, including, without limitation, ownership of all United States and foreign copyrights, patent rights, trademark and trade dress rights, trade secret rights, and all other intellectual property or proprietary rights in each Development. Employee shall cooperate with Company in obtaining, maintaining, and enforcing all intellectual property rights relating to Developments, as Company deems necessary or appropriate, including, without limitation, executing and delivering, upon the request of Company, any and all instruments, documents and papers, giving evidence and doing any and all other reasonable acts that, in the opinion of counsel for Company, are or may be necessary or desirable to document the transfer of rights in the Developments or to enable Company to file and prosecute applications for and to acquire, maintain and enforce any and all patents, trademark registrations or copyrights under United States or foreign law with respect to any such Developments or to obtain any extension, validation, re-issue, continuance or renewal of any such patent, trademark or copyright. This assignment is undertaken in part as a contingency against the possibility that any such Development, by operation of applicable copyright law, may not be considered a work made for hire by Employee for Company. Employee also hereby waives and relinquishes all claims to moral rights in any Developments.

3. **Non-Solicitation and Non-Interference**.

3.1 **Buyers and Providers, Generally**.  Company often acts as a broker between two types of businesses.  The first type of businesses are generally referred to as "Advertisers," and they buy or sell (one or both of) (a) information of particular customers who may be interested in particular types of products or services ("Leads") or (b) Internet users who were directed through one or more hyperlinks to a website because they viewed or interacted with some type of online media ("Internet Traffic," for the sake of clarity buying or selling Internet Traffic does not include the transfer of customer information in the same manner as would buying or selling a Lead) (such buyers of Leads referred to more specifically as "Lead Buyers" or both types generally referred to as "Advertisers").  The second type of businesses are generally referred to as "Publishers," and they have Internet properties, such as, but not limited to, websites, or other marketing capacities, such as, but not limited to, email lists, capable of generating Leads or Internet traffic (such sellers of Leads  referred to more specifically as "Lead Providers" or both types generally referred to as "Publishers"). Company maintains lists of, pricing, technical details, performance statistics and competitively sensitive information related to both Publishers and Advertisers. Employee acknowledges and agrees that information pertaining to both Publishers and Advertisers are competitively sensitive, regardless of whether Company sends or receives payment from such party.

3.2      **Advertisers and Customers.**  As long as he is rendering services to Company and for a period of one (1) year thereafter ("Customer Solicitation Restriction Period"), Employee shall not contact or communicate with, directly or indirectly, on behalf of himself or any other person or entity, any person or entity who has been a customer or Advertiser of Company or its affiliates during such period with the purpose or effect of (i) interfering with Company's relationship with or sales of any products or services to such customer or Advertiser or (ii) providing, selling, or attempting to sell any products or services from an entity or person other than Company, where such products or services are of the type offered for sale or provided by Company while Employee was employed by Company and specifically including (a) providing, selling, or attempting to provide or sell Leads for any industry that Company purchased or sold Leads during the above-mentioned restriction period (such as, but not limited to short-term consumer loan, payday loan, and auto-insurance industries), (b) providing or selling Internet Traffic or driving Internet users to web pages specified by such customer or Advertiser, and (c) selling advertising inventory space or Internet traffic to any such customer or Advertiser. Notwithstanding subsection (ii) of the prior sentence, conditioned upon Employee's compliance with all other provisions of this Agreement and only with respect to customers or Advertisers unrelated to payday or consumer loans, the Customer Solicitation Restriction Period as to any contacts or communications that are exclusively to provide, sell, or attempt to provide or sell Internet Traffic is the duration of time he is rendering services to Company and six (6) months thereafter.

3.3      **Publishers.** As long as he is rendering services to Company and for a period of one (1) year thereafter ("Publisher Solicitation Restriction Period"), Employee shall not contact or communicate with, directly or indirectly, on behalf of himself or any other person or entity, any person or entity who has been a Publisher of Company or its affiliates during such period with the purpose or effect of (i) purchasing online media, advertising space, Internet Traffic, or Leads from such Publisher, (ii) promoting through any on-line means advertisements, products or services through such Publisher, (iii) compensating such Publisher for online advertising services, or (iv) interfering with Company's relationship with such Publisher or inducing or causing such Publisher to terminate or reduce his/her/its relationship with Company. Notwithstanding subsections (i)-(iii) of the prior sentence, conditioned upon Employee's compliance with all other provisions of this Agreement and only with respect to Publishers

3 of 8

unrelated to payday or consumer loans, the Publisher Solicitation Restriction Period as to any contacts or communications that are exclusively to buy Internet Traffic is the duration of time he is rendering services to Company and six (6) months thereafter.

3.4 **Suppliers.** Except as otherwise provided for in Section 3.3, for as long as he is rendering services to Company and for a period of one (1) year thereafter, Employee shall not contact or communicate with, on behalf of himself or any other person or entity, any person or entity who has provided products or services to Company or its affiliates during such period to (i) interfere with Company's relationship with such supplier or (ii) induce or cause such supplier to terminate his/her/its relationship with Company.

3.5 **Employees.** For as long as he is rendering services to Company and for a period of two (2) years thereafter, Employee shall not hire (or assist in the hire) or employ any person who was an employee of Company or its affiliates during such period or contact or communicate, directly or indirectly, on behalf of himself or any other person or entity, with the purpose or effect of (i) interfering with Company's relationship with such employee or (ii) inducing or causing such employee to terminate his/her/its relationship with Company.

3.6 **Reasonableness.** Employee agrees and acknowledges that he has knowledge of the Company's customers, Advertisers, Publishers, Suppliers, employees, and contractors as a result of the performance of his duties on behalf of the Company, and that the scope of the non-solicitation and non-interference provisions of this Section 3 are reasonable to protect the Company's legitimate business interests. Employee further acknowledges that the Company would be placed at an unfair competitive disadvantage if he were to violate the terms of this Section 3.

4. **Non-Competition.**

4.1 **Affiliate Business Non-Competition.** For as long as he is rendering services to Company and for a period of six (6) months thereafter, Employee shall not participate, directly or indirectly, as an owner, employee, consultant, contractor, director, member, manager, partner, joint venturer, source of financing or otherwise, in any sole proprietorship, corporation, partnership, limited liability company or other business or entity that directly or indirectly (a) engages in affiliate marketing, where Internet Traffic is purchased or generated, such as but not limited to through websites, emails, or by displaying online advertisements, in a manner designed to sell it to a particular third-party, with compensation based on performance (such as, but not limited to, because users complete an action or make a purchase), or (b) engage in conduct in preparation of providing any of the products or services specified in (a) during the restriction period (collectively referred to as "Participating in an Affiliate Business").

4.2 **General Non-Compete.** Except to the extent Employee's conduct would solely constitute Participating in an Affiliate Business, for as long as he is rendering services to Company and for a period of one (1) year thereafter, Employee shall not participate, directly or indirectly, as an owner, employee, consultant, contractor, director, member, manager, partner, joint venturer, source of financing or otherwise, in any sole proprietorship, corporation, partnership, limited liability company or other business or entity that directly or indirectly (a) purchases or sells online Leads for any industry that Company purchased or sold Leads during the above-mentioned restriction period, including, but not limited to, consumer finance and auto-insurance industries, (b) engages in any other business that Company actually engaged in during the period of Employee's employment, (c) engages in any other business that Employee was aware during the period of his employment that Company was considering

entering and subsequently entered during or after Employee's employment, or (d) engage in conduct in preparation of providing any of the products or services specified in (a)-(c) above during the restriction period.

4.3 **Scope.** Employee acknowledges and agrees that Company's operations are worldwide in scope and that the foregoing restriction shall apply within the United States as well as any other country where Company conducts business.  Employee specifically acknowledges that the geographic region to which this restriction applies is reasonable because that is the region in which the Company competes and is the region in which Employee's knowledge of the Company could put the Company at an unfair competitive disadvantage if this provision were not to be enforced.

4.4 **Reasonableness and Exclusions.** Employee further acknowledges that and agrees that the time restrictions provided by this Section 4 are necessary for the Confidential Information of the Company for which Employee has or will have knowledge to become stale so that Employee's employment by a competing business will not place the Company at an unfair competitive disadvantage.  The foregoing restriction shall not be construed to prohibit the ownership by Employee as a passive investment of not more than five percent (5%) of any class securities of any corporation which is engaged in any of the foregoing businesses having a class of securities registered pursuant to the Securities Exchange Act of 1934.

5.    **United States Government Obligations.** Employee acknowledges that the Company from time to time may have agreements with other persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. Employee agrees to be bound by all such obligations and restrictions which are made known to Employee and to take all action necessary to discharge the obligations of the Company under such agreements.

6.    **Acknowledgment.** Employee represents and warrants that (i) his knowledge, skills and abilities are sufficient to permit him to earn a satisfactory livelihood without violating any provision of this Agreement and that enforcement of the provisions hereof will not cause him undue hardship; (ii) the benefits conferred on him by Company simultaneously with the execution of this Agreement are adequate consideration for his agreement to and performance of the provisions of this Agreement; and (iii) the restrictions set forth in this Agreement are necessary to protect the legitimate proprietary interests of Company, including, without limitation, its proprietary products, trade secrets and other intellectual property that it has invested substantial time and resources to develop.

7.    **Remedies.** Employee agrees and acknowledges that the injury that would be suffered by Company as a result of breach of the provisions of Paragraphs 1, 3, or 4 would be irreparable and that an award of monetary damages to the Company for such breach would be an inadequate remedy.  Consequently, the Company shall have the right in addition to any other rights it may have, to obtain injunctive relief from any court of competent jurisdiction to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company shall not be obligated to post bond or other security in seeking such relief. Without limiting the either party's rights under this paragraph or any other remedies, if either party breaches any provisions of Paragraphs 1, 3, or 4, and the other party obtains an injunction or final judgment relating to such violation, the prevailing party of such injunction or judgment shall have the additional right to recover all reasonable attorneys' fees and costs.

8.   **Notification.** Any person employing Employee or evidencing any intention to employ Employee may be notified as to the existence and provisions of this Agreement.

9.   **Survival.** The provisions of this Agreement shall survive the expiration or termination of the relationship whereby Employee renders services to Company.

10.   **Modification of Covenants; Enforceability.** In the event that any provision of this Agreement is held to be in any respect an unreasonable or unenforceable restriction, then such provision shall not be void or voidable, but shall be deemed reformed, or shall be deemed excised from this Agreement, as the case may require, in such jurisdiction and this Agreement shall be construed and enforced to the maximum time, geographic, product or service, or other limitations permitted by applicable law as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be; it being acknowledged by the parties that the representations and covenants set forth herein are of the essence to the relationship between Company and Employee.   Employee acknowledges that a principal inducement for entering into this Agreement is a grant of employment or engagement to him.   Employee further acknowledges that Company would not have offered such employment or engagement without Employee's execution and delivery of this Agreement.

11.   **No Employment Contract.** Employee understands that this Agreement does not itself constitute a contract for employment or a contractual engagement for services. Except as otherwise provided in written agreements executed by Company, Company may terminate its relationship with Employee at will and Employee may voluntarily terminate his relationship with Company at will.

12.   **Miscellaneous.**

   12.1   **Amendments; Waivers.** No amendment, modification, or waiver of any provision of this Agreement shall be binding unless in writing and signed by the party against whom the operation of such amendment, modification, or waiver is sought to be enforced. No delay in the exercise of any right shall be deemed a waiver thereof, nor shall the waiver of a right or remedy in a particular instance constitute a waiver of such right or remedy generally.

   12.2   **Notices.** Any notice or document required or permitted to be given under this Agreement may be given by a party or by its legal counsel and shall be deemed to be given (i) one day after the date such notice is deposited with a commercial overnight delivery service with delivery fees paid, or (ii) on the date transmitted by facsimile or electronic mail with transmission acknowledgment, to the principal business address of Company or the address on file for Employee in Company's records, or such other address or addresses as the parties may designate from time to time by notice satisfactory under this section. A copy of any notice to Company shall be sent to the attention of General Counsel at The Cira Centre, 2929 Arch Street, 11th Floor, Philadelphia, PA 19104, provided that such copy shall not itself constitute notice.

   12.3   **Governing Law.** This Agreement shall be governed by the internal laws of Pennsylvania without giving effect to the principles of conflicts of laws. Each party hereby consents to the personal jurisdiction of the Federal or Pennsylvania courts located in Philadelphia County, Pennsylvania, and agrees that all disputes arising from or relating to this Agreement shall be adjudicated in such courts. Employee further expressly and irrevocably waives any objection to the personal jurisdiction or venue of such courts and consents to service of process by notice sent by regular mail to the address set forth

above and/or by any means authorized by Pennsylvania law.

    **12.4**    **Representations by Employee.** Employee hereby warrants and represents that (i) Employee's performance of services on behalf of Company do not violate or conflict with any contract or other obligation to which he is a party or by which Employee is bound, including any agreement with or other obligation to a former employer, and (ii) Employee will not disclose to the Company, induce the Company to use or misappropriate any confidential or proprietary information or material belonging to any previous employer or others.

    **12.5**    **Language Construction.** The language of this Agreement shall be construed in accordance with its fair meaning and not for or against any party. The parties acknowledge that each party and its counsel have reviewed and had the opportunity to participate in the drafting of this Agreement and, accordingly, that the rule of construction that would resolve ambiguities in favor of non-drafting parties shall not apply to the interpretation of this Agreement.

    **12.6**    **Assignment.** Employee may not assign his rights or duties hereunder without the prior written consent of Company. Company may assign its rights and duties in connection with a merger, sale, consolidation, restructuring or other disposition of all or a portion of its business or to an affiliate controlling, controlled by or under common control with Company.

    **12.7**    **No Third Party Beneficiaries.** Except as otherwise specifically provided in this Agreement, this Agreement is made for the sole benefit of the parties. No other persons shall have any rights or remedies by reason of this Agreement against any of the parties or shall be considered to be third party beneficiaries of this Agreement in any way.

    **12.8**    **Binding Effect.** This Agreement shall inure to the benefit of the respective heirs, legal representatives, successors and permitted assigns of each party, and shall be binding upon the heirs, legal representatives, successors and assigns of each party.

    **12.9**    **Titles and Captions.** All article, section and paragraph titles and captions contained in this Agreement are for convenience only and are not deemed a part hereof.

    **12.10**    **Pronouns and Plurals.** All pronouns and any variations thereof are deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

    **12.11**    **Days.** Any period of days mandated under this Agreement shall be determined by reference to calendar days, not business days, except that any payments, notices, or other performance falling due on a Saturday, Sunday, or federal government holiday shall be considered timely if paid, given, or performed on the next succeeding business day.

    **12.12**    **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements and understandings with respect to such subject matter.

    **12.13**    **Severability.** If any provision of this Agreement or application thereof to anyone under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provisions or applications of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision in any other jurisdiction.

**12.14   Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be original and all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first written above.

Affluent Ads, LLC                                    Employee

By

_____          _____
Zachary Robbins, Managing Member          Jovan Caputo

# EXHIBIT 2

**INVENTION, NON-DISCLOSURE, NON-SOLICITATION, AND NON-COMPETITION AGREEMENT**

This is an Agreement, entered into on June 4, 2013, by and between Affluent Ads, LLC (D/B/A Leadnomics) ("Company"), and Philip Lynch ("Employee").

### Background

WHEREAS, Employee is employed by Company. The parties wish to set forth certain restrictions concerning confidential information, inventions, and competition.

WHEREAS, the Employee agrees and acknowledges that he would not be entitled to the consideration being provided pursuant to his employment but for his acceptance of the terms and conditions of this Agreement.

WHEREAS, the Employee agrees and acknowledges that he will have access to confidential and non-public business information of the Company in connection with the performance of his duties for the Company, the disclosure of which would irrevocably harm the Company.

NOW, THEREFORE, intending to be legally bound and acknowledging the receipt of adequate consideration, the parties hereby agree and covenant as follows:

1. **Confidential Information.**

   **1.1** **In General.** Employee's duties will give him substantial exposure to the Company's operations, technology, business strategy, and other non-public information that is essential to the success of the Company and that provides the Company with a competitive advantage. All information of a private, proprietary or confidential nature concerning Company's or its affiliates' business, business relationships or financial affairs ("Confidential Information"), whether in written, electronic or other form, shall be the exclusive property of Company. Without limiting the foregoing, Confidential Information may include, without limitation, inventions, products, processes, methods, models, algorithms, techniques, formulae, projects, developments, plans, research data, financial data, personnel data, computer programs, source code, other technology, know-how, patent applications, customer and supplier lists, personal or behavioral information relating to Internet users, and identifying information or other facts relating to customers or prospective customers. Employee will not disclose any Confidential Information to any person or entity other than employees of Company or other persons providing services to Company or use the same for any purposes (other than in the performance of his/her duties providing services to Company) without written approval by an officer of Company, either while performing services on behalf of Company or at any time thereafter. Employee agrees and acknowledges that the Company has exercised reasonable efforts to secure its Confidential Information, including, but not limited to, restricting access to them to those Company employees who need to access such information in the performance of their duties for the Company, enacting and enforcing policies regarding the authorized uses for them, and not disclosing them to third-parties. You further agree and acknowledge that the Company's Confidential Information are of value to the Company and were created and maintained at significant expense to the Company.

   **1.2** **Ownership of Property.** All files, letters, memoranda, reports, records, data, sketches, drawings, notes and all other written or electronic material containing Confidential Information, whether created by Employee or others, which shall come into his custody or possession, shall be and

are the exclusive property of Company to be used by Employee only in the performance of his duties for Company. All such materials or copies thereof and all tangible property of Company in the custody or possession of Employee shall be delivered to Company (or destroyed, at Company's direction), upon the earlier of (i) a request by Company or (ii) termination of Employee's relationship with Company. After such delivery, Employee shall not retain any such materials or copies thereof or any such tangible property.

     1.3     **Reasonable Diligence.** Employee shall use reasonable diligence to avoid disclosure or unauthorized use of Confidential Information including, without limitation, retaining Confidential Information in a secure place with access limited to authorized persons and otherwise complying with Company's security policies that are furnished to Employee from time to time. If Employee becomes aware, or reasonably believes, that Confidential Information has been disclosed or used without authorization, Employee shall promptly notify Company and provide all information available concerning such disclosure or unauthorized use.

     1.4     **Information and Property of Others.** The obligations of Employee under this section 1 shall apply to confidential information and materials of customers and suppliers of Company and other third parties who may have disclosed or entrusted the same to Company or to Employee.

2.     **Inventions.**

     2.1     **Disclosure.** Employee will make full and prompt disclosure to Company of all inventions, improvements, concepts, ideas, software, designs, product developments, works of authorship and other intellectual property, whether patentable or not, which are created, made, conceived or reduced to practice by Employee or under Employee's direction or jointly with others during the period of performing services on behalf of Company, whether or not during normal working hours or on the premises of Company, and which (i) relate to the present or planned business activities of Company, (ii) incorporate, are based upon or derive from Company's Confidential Information, or (iii) were created, made, conceived or reduced to practices in connection with Company's facilities, equipment or other resources ("Developments").

     2.2     **Assignment.** Employee hereby assigns, transfers and conveys to Company all of his right, title and interest in and to any and all Developments, including, without limitation, ownership of all United States and foreign copyrights, patent rights, trademark and trade dress rights, trade secret rights, and all other intellectual property or proprietary rights in each Development. Employee shall cooperate with Company in obtaining, maintaining, and enforcing all intellectual property rights relating to Developments, as Company deems necessary or appropriate, including, without limitation, executing and delivering, upon the request of Company, any and all instruments, documents and papers, giving evidence and doing any and all other reasonable acts that, in the opinion of counsel for Company, are or may be necessary or desirable to document the transfer of rights in the Developments or to enable Company to file and prosecute applications for and to acquire, maintain and enforce any and all patents, trademark registrations or copyrights under United States or foreign law with respect to any such Developments or to obtain any extension, validation, re-issue, continuance or renewal of any such patent, trademark or copyright. This assignment is undertaken in part as a contingency against the possibility that any such Development, by operation of applicable copyright law, may not be considered a work made for hire by Employee for Company. Employee also hereby waives and relinquishes all claims to moral rights in any Developments.

3.    **Non-Solicitation and Non-Interference.**

3.1 **Buyers and Providers, Generally.**  Company often acts as a broker between two types of businesses.  The first type of businesses are generally referred to as "Advertisers," and they buy or sell (one or both of) (a) information of particular customers who may be interested in particular types of products or services ("Leads") or (b) Internet users who were directed through one or more hyperlinks to a website because they viewed or interacted with some type of online media ("Internet Traffic," for the sake of clarity buying or selling Internet Traffic does not include the transfer of customer information in the same manner as would buying or selling a Lead) (such buyers of Leads referred to more specifically as "Lead Buyers" or both types generally referred to as "Advertisers").  The second type of businesses are generally referred to as "Publishers," and they have Internet properties, such as, but not limited to, websites, or other marketing capacities, such as, but not limited to, email lists, capable of generating Leads or Internet traffic (such sellers of Leads  referred to more specifically as "Lead Providers" or both types generally referred to as "Publishers"). Company maintains lists of, pricing, technical details, performance statistics and competitively sensitive information related to both Publishers and Advertisers. Employee acknowledges and agrees that information pertaining to both Publishers and Advertisers are competitively sensitive, regardless of whether Company sends or receives payment from such party.

3.2    **Advertisers and Customers.**  As long as he is rendering services to Company and for a period of one (1) year thereafter ("Customer Solicitation Restriction Period"), Employee shall not contact or communicate with, directly or indirectly, on behalf of himself or any other person or entity, any person or entity who has been a customer or Advertiser of Company or its affiliates during such period with the purpose or effect of (i) interfering with Company's relationship with or sales of any products or services to such customer or Advertiser or (ii) providing, selling, or attempting to sell any products or services from an entity or person other than Company, where such products or services are of the type offered for sale or provided by Company while Employee was employed by Company and specifically including (a) providing, selling, or attempting to provide or sell Leads for any industry that Company purchased or sold Leads during the above-mentioned restriction period (such as, but not limited to short-term consumer loan, payday loan, and auto-insurance industries), (b) providing or selling Internet Traffic or driving Internet users to web pages specified by such customer or Advertiser, and (c) selling advertising inventory space or Internet traffic to any such customer or Advertiser. Notwithstanding subsection (ii) of the prior sentence, conditioned upon Employee's compliance with all other provisions of this Agreement and only with respect to customers or Advertisers unrelated to payday or consumer loans, the Customer Solicitation Restriction Period as to any contacts or communications that are exclusively to provide, sell, or attempt to provide or sell Internet Traffic is the duration of time he is rendering services to Company and six (6) months thereafter.

3.3    **Publishers.** As long as he is rendering services to Company and for a period of one (1) year thereafter ("Publisher Solicitation Restriction Period"), Employee shall not contact or communicate with, directly or indirectly, on behalf of himself or any other person or entity, any person or entity who has been a Publisher of Company or its affiliates during such period with the purpose or effect of (i) purchasing online media, advertising space, Internet Traffic, or Leads from such Publisher, (ii) promoting through any on-line means advertisements, products or services through such Publisher, (iii) compensating such Publisher for online advertising services, or (iv) interfering with Company's relationship with such Publisher or inducing or causing such Publisher to terminate or reduce his/her/its relationship with Company. Notwithstanding subsections (i)-(iii) of the prior sentence, conditioned upon Employee's compliance with all other provisions of this Agreement and only with respect to Publishers

unrelated to payday or consumer loans, the Publisher Solicitation Restriction Period as to any contacts or communications that are exclusively to buy Internet Traffic is the duration of time he is rendering services to Company and six (6) months thereafter.

3.4 **Suppliers.** Except as otherwise provided for in Section 3.3, for as long as he is rendering services to Company and for a period of one (1) year thereafter, Employee shall not contact or communicate with, on behalf of himself or any other person or entity, any person or entity who has provided products or services to Company or its affiliates during such period to (i) interfere with Company's relationship with such supplier or (ii) induce or cause such supplier to terminate his/her/its relationship with Company.

3.5 **Employees.** For as long as he is rendering services to Company and for a period of two (2) years thereafter, Employee shall not hire (or assist in the hire) or employ any person who was an employee of Company or its affiliates during such period or contact or communicate, directly or indirectly, on behalf of himself or any other person or entity, with the purpose or effect of (i) interfering with Company's relationship with such employee or (ii) inducing or causing such employee to terminate his/her/its relationship with Company.

3.6 **Reasonableness.** Employee agrees and acknowledges that he has knowledge of the Company's customers, Advertisers, Publishers, Suppliers, employees, and contractors as a result of the performance of his duties on behalf of the Company, and that the scope of the non-solicitation and non-interference provisions of this Section 3 are reasonable to protect the Company's legitimate business interests. Employee further acknowledges that the Company would be placed at an unfair competitive disadvantage if he were to violate the terms of this Section 3.

4. **Non-Competition.**

4.1 **Affiliate Business Non-Competition.** For as long as he is rendering services to Company and for a period of six (6) months thereafter, Employee shall not participate, directly or indirectly, as an owner, employee, consultant, contractor, director, member, manager, partner, joint venturer, source of financing or otherwise, in any sole proprietorship, corporation, partnership, limited liability company or other business or entity that directly or indirectly (a) engages in affiliate marketing, where Internet Traffic is purchased or generated, such as but not limited to through websites, emails, or by displaying online advertisements, in a manner designed to sell it to a particular third-party, with compensation based on performance (such as, but not limited to, because users complete an action or make a purchase), or (b) engage in conduct in preparation of providing any of the products or services specified in (a) during the restriction period (collectively referred to as "Participating in an Affiliate Business").

4.2 **General Non-Compete.** Except to the extent Employee's conduct would solely constitute Participating in an Affiliate Business, for as long as he is rendering services to Company and for a period of one (1) year thereafter, Employee shall not participate, directly or indirectly, as an owner, employee, consultant, contractor, director, member, manager, partner, joint venturer, source of financing or otherwise, in any sole proprietorship, corporation, partnership, limited liability company or other business or entity that directly or indirectly (a) purchases or sells online Leads for any industry that Company purchased or sold Leads during the above-mentioned restriction period, including, but not limited to, consumer finance and auto-insurance industries, (b) engages in any other business that Company actually engaged in during the period of Employee's employment, (c) engages in any other business that Employee was aware during the period of his employment that Company was considering

entering and subsequently entered during or after Employee's employment, or (d) engage in conduct in preparation of providing any of the products or services specified in (a)-(c) above during the restriction period.

4.3 **Scope.** Employee acknowledges and agrees that Company's operations are worldwide in scope and that the foregoing restriction shall apply within the United States as well as any other country where Company conducts business. Employee specifically acknowledges that the geographic region to which this restriction applies is reasonable because that is the region in which the Company competes and is the region in which Employee's knowledge of the Company could put the Company at an unfair competitive disadvantage if this provision were not to be enforced.

4.4 **Reasonableness and Exclusions.** Employee further acknowledges that and agrees that the time restrictions provided by this Section 4 are necessary for the Confidential Information of the Company for which Employee has or will have knowledge to become stale so that Employee's employment by a competing business will not place the Company at an unfair competitive disadvantage. The foregoing restriction shall not be construed to prohibit the ownership by Employee as a passive investment of not more than five percent (5%) of any class securities of any corporation which is engaged in any of the foregoing businesses having a class of securities registered pursuant to the Securities Exchange Act of 1934.

5.    **United States Government Obligations.** Employee acknowledges that the Company from time to time may have agreements with other persons or with the United States Government, or agencies thereof, which impose obligations or restrictions on the Company regarding inventions made during the course of work under such agreements or regarding the confidential nature of such work. Employee agrees to be bound by all such obligations and restrictions which are made known to Employee and to take all action necessary to discharge the obligations of the Company under such agreements.

6.    **Acknowledgment.** Employee represents and warrants that (i) his knowledge, skills and abilities are sufficient to permit him to earn a satisfactory livelihood without violating any provision of this Agreement and that enforcement of the provisions hereof will not cause him undue hardship; (ii) the benefits conferred on him by Company simultaneously with the execution of this Agreement are adequate consideration for his agreement to and performance of the provisions of this Agreement; and (iii) the restrictions set forth in this Agreement are necessary to protect the legitimate proprietary interests of Company, including, without limitation, its proprietary products, trade secrets and other intellectual property that it has invested substantial time and resources to develop.

7.    **Remedies.** Employee agrees and acknowledges that the injury that would be suffered by Company as a result of breach of the provisions of Paragraphs 1, 3, or 4 would be irreparable and that an award of monetary damages to the Company for such breach would be an inadequate remedy. Consequently, the Company shall have the right in addition to any other rights it may have, to obtain injunctive relief from any court of competent jurisdiction to restrain any breach or threatened breach or otherwise to specifically enforce any provision of this Agreement and the Company shall not be obligated to post bond or other security in seeking such relief. Without limiting the either party's rights under this paragraph or any other remedies, if either party breaches any provisions of Paragraphs 1, 3, or 4, and the other party obtains an injunction or final judgment relating to such violation, the prevailing party of such injunction or judgment shall have the additional right to recover all reasonable attorneys' fees and costs.

8.    **Notification.** Any person employing Employee or evidencing any intention to employ Employee may be notified as to the existence and provisions of this Agreement.

9.    **Survival.** The provisions of this Agreement shall survive the expiration or termination of the relationship whereby Employee renders services to Company.

10.   **Modification of Covenants; Enforceability.** In the event that any provision of this Agreement is held to be in any respect an unreasonable or unenforceable restriction, then such provision shall not be void or voidable, but shall be deemed reformed, or shall be deemed excised from this Agreement, as the case may require, in such jurisdiction and this Agreement shall be construed and enforced for the maximum time, geographic, product or service, or other limitations permitted by applicable law as if such provision had been originally incorporated herein as so modified or restricted, or as if such provision had not been originally incorporated herein, as the case may be; it being acknowledged by the parties that the representations and covenants set forth herein are of the essence to the relationship between Company and Employee.   Employee acknowledges that a principal inducement for entering into this Agreement is a grant of employment or engagement to him.  Employee further acknowledges that Company would not have offered such employment or engagement without Employee's execution and delivery of this Agreement.

11.   **No Employment Contract.** Employee understands that this Agreement does not itself constitute a contract for employment or a contractual engagement for services. Except as otherwise provided in written agreements executed by Company, Company may terminate its relationship with Employee at will and Employee may voluntarily terminate his relationship with Company at will.

12.   **Miscellaneous.**

     12.1    **Amendments; Waivers.** No amendment, modification, or waiver of any provision of this Agreement shall be binding unless in writing and signed by the party against whom the operation of such amendment, modification, or waiver is sought to be enforced. No delay in the exercise of any right shall be deemed a waiver thereof, nor shall the waiver of a right or remedy in a particular instance constitute a waiver of such right or remedy generally.

     12.2    **Notices.** Any notice or document required or permitted to be given under this Agreement may be given by a party or by its legal counsel and shall be deemed to be given (i) one day after the date such notice is deposited with a commercial overnight delivery service with delivery fees paid, or (ii) on the date transmitted by facsimile or electronic mail with transmission acknowledgment, to the principal business address of Company or the address on file for Employee in Company's records, or such other address or addresses as the parties may designate from time to time by notice satisfactory under this section. A copy of any notice to Company shall be sent to the attention of General Counsel at The Cira Centre, 2929 Arch Street, 11th Floor, Philadelphia, PA 19104, provided that such copy shall not itself constitute notice.

     12.3    **Governing Law.** This Agreement shall be governed by the internal laws of Pennsylvania without giving effect to the principles of conflicts of laws. Each party hereby consents to the personal jurisdiction of the Federal or Pennsylvania courts located in Philadelphia County, Pennsylvania, and agrees that all disputes arising from or relating to this Agreement shall be adjudicated in such courts. Employee further expressly and irrevocably waives any objection to the personal jurisdiction or venue of such courts and consents to service of process by notice sent by regular mail to the address set forth

above and/or by any means authorized by Pennsylvania law.

12.4 **Representations by Employee.** Employee hereby warrants and represents that (i) Employee's performance of services on behalf of Company do not violate or conflict with any contract or other obligation to which he is a party or by which Employee is bound, including any agreement with or other obligation to a former employer, and (ii) Employee will not disclose to the Company, induce the Company to use or misappropriate any confidential or proprietary information or material belonging to any previous employer or others.

12.5 **Language Construction.** The language of this Agreement shall be construed in accordance with its fair meaning and not for or against any party. The parties acknowledge that each party and its counsel have reviewed and had the opportunity to participate in the drafting of this Agreement and, accordingly, that the rule of construction that would resolve ambiguities in favor of non-drafting parties shall not apply to the interpretation of this Agreement.

12.6 **Assignment.** Employee may not assign his rights or duties hereunder without the prior written consent of Company. Company may assign its rights and duties in connection with a merger, sale, consolidation, restructuring or other disposition of all or a portion of its business or to an affiliate controlling, controlled by or under common control with Company.

12.7 **No Third Party Beneficiaries.** Except as otherwise specifically provided in this Agreement, this Agreement is made for the sole benefit of the parties. No other persons shall have any rights or remedies by reason of this Agreement against any of the parties or shall be considered to be third party beneficiaries of this Agreement in any way.

12.8 **Binding Effect.** This Agreement shall inure to the benefit of the respective heirs, legal representatives, successors and permitted assigns of each party, and shall be binding upon the heirs, legal representatives, successors and assigns of each party.

12.9 **Titles and Captions.** All article, section and paragraph titles and captions contained in this Agreement are for convenience only and are not deemed a part hereof.

12.10 **Pronouns and Plurals.** All pronouns and any variations thereof are deemed to refer to the masculine, feminine, neuter, singular or plural as the identity of the person or persons may require.

12.11 **Days.** Any period of days mandated under this Agreement shall be determined by reference to calendar days, not business days, except that any payments, notices, or other performance falling due on a Saturday, Sunday, or federal government holiday shall be considered timely if paid, given, or performed on the next succeeding business day.

12.12 **Entire Agreement.** This Agreement constitutes the entire agreement between the parties with respect to its subject matter and supersedes all prior agreements and understandings with respect to such subject matter.

12.13 **Severability.** If any provision of this Agreement or application thereof to anyone under any circumstances is adjudicated to be invalid or unenforceable in any jurisdiction, such invalidity or unenforceability shall not affect any other provisions or applications of this Agreement which can be given effect without the invalid or unenforceable provision or application and shall not invalidate or render unenforceable such provision in any other jurisdiction.

12.14   **Counterparts.**  This Agreement may be executed in one or more counterparts, each of which shall be original and all of which taken together shall constitute one and the same instrument.

IN WITNESS WHEREOF, the parties have executed this Agreement on the date first written above.

Affluent Ads, LLC                                    Employee

By

_____            _____
Zachary Robbins, Managing Member            Philip Lynch

# EXHIBIT 3

Philip Lynch | LinkedIn

file://///phl1nas2/JKrause070$/Personal/Leadnomics/Philip Lynch _ ...



**Philip Lynch**
VP Business Development & Operations, Leadnomics
Partner Network at Leadnomics
Greater New York City Area | Online Media

| Previous | Leadnomics, AdsVehicle.com, AdoTube, An Exponential Division |
| Education | Binghamton University |

[Connect]   [Send Philip InMail]   ▾

500+ connections

https://www.linkedin.com/in/phillynch          Contact Info

**Background**

**Summary**

Entrepreneurial and successful online marketing professional. VP level Business Development Manager with expertise in all facets of online marketing. 9 years of experience within the online advertising industry with vast knowledge of display CPA, CPC, CPM, SEM, Contextual CPC, Social and Mobile Advertising / Media Buying. Extensive knowledge of distribution and optimization on both the client and agency side. Working knowledge of Email marketing, Behavioral targeting and Feed Management (PI).

My Goals:
-Plan and achieve business goals between both publishers and advertisers to ensure maximum ROI.
-Continue a proven history of success in client relationships and the ability to manage and grow key accounts.
-Prospect and form relationships with top-tier CPC-CPM-CPA Display, Mobile, Search and Email publishers.
-Manage overall strategy, operations and business initiatives.

**Experience**

**VP Business Development & Operations, Leadnomics Partner Network**
Leadnomics
May 2015 – Present (1 year 3 months) | Greater New York City Area

-Responsible for the Leadnomics Partner Network P&L, operations and business initiatives between both publishers & advertisers.

-Ensure maximum ROI for both publishers and advertisers by identifying profitable streams of revenue while diversifying the company's portfolio into new verticals.

-Manage the overall strategy, business development team and key publisher relationships for the Leadnomics Partner Network which consists of almost 50 advertiser verticals across more than two thousand publisher partners.

**Director of Leadnomics Partner Network**
Leadnomics
June 2013 – May 2015 (2 years) | Greater New York City Area

Leadnomics is an online marketing company that generates millions of leads every year for financial institutions and insurance companies in the US and the UK. The company specializes in finding the right customers for clients by running highly targeted campaigns across a variety of online channels.
In 2012, Leadnomics was ranked #26 and #1 in Philadelphia on the Inc. 500 list, an annual ranking of the nation's fastest-growing privately held companies, up from #48 in 2011. In its sector, advertising & marketing, Leadnomics was ranked #3.

People Similar to Philip

Jovan Caputo  2nd
VP Sales and Distribution, Leadnomics Partn...
Connect

Ads You May Be Interested In

**59 New PA Clients**
59 new legal clients seeking a PA attorney. View their cases today.

**Wrongfully Terminated?**
Talk to one of our Employment Attorneys today. We fight for your rights.

**Cornell Master's in NYC**
Without Interrupting Your Career Weekend Classes for Professionals

Nick Sclafani
Senior Distribution Manager at Leadnomics

Josh Warner
Digital Marketing | Product Management | Media Buying

Drew Johnson
Business Development at Leadnomics

Bona Daniel
Affiliate Manager at DMi Partners

Dan Hughes
V.P. of Business Development at Path 56 Media

Claudia Stringham
Human Resources & Office Administration

Omar Abdelhamid
VP of Operations at Leadnomics

Add new skills with these courses

**Top 5 Money-Saving AdWords Tips**
Viewers: 7,612

**Google AdWords Essential Training**

7/20/2016 4:29 PM

Philip Lynch | LinkedIn                                    file://///phl1nas2/JKrause070$/Personal/Leadnomics/Philip Lynch _ ...

Advanced

Jovan Caputo

Dismiss – Only you can see your recent searches

**Seni...**
AdoTu...
2012 – March 2013 (1 year) | Greater New York City Area

AdoTube™ is a global in-stream video advertising company. AdoTube provides publishers and advertisers with easy and efficient access to in-stream video advertising and the solutions to target and optimize across multiple devices and video formats. AdoTube is a division of exponential, a global digital advertising company with presence in 25 countries worldwide.

-Responsible for the creation of partnerships with top-tier Mobile WAP and In-App publishers.

You

Athas Nikolakakos

Ask Athas for an introduction ›

See more connections in common

Philip Lynch

**Senior Business Development Manager, Publisher Development**
Adknowledge
August 2010 – July 2012 (2 years) | Greater New York City Area

Adknowledge the fourth largest advertiser marketplace, specializes in performance-based marketing solutions that help make the long tail web accessible to advertisers. Utilizing powerful predictive technology and completely anonymous consumer response patterns, we connect advertisers with consumers across multiple channels, including email, search, mobile, domains, and social networks. Advertisers can choose between CPC, CPA and CPM pricing models.

-Responsible for the creation of new CPC / CPA business development deals with top publishers increasing overall revenue in the Adknowledge marketplace.

-Managing partner accounts and growing their revenue/profit numbers while optimizing their operations.

**Senior Manager, Publisher Development**
Epic Media Group
January 2007 – July 2010 (3 years 7 months) | Greater New York City Area

-Responsible for negotiating partnerships and executing business development initiatives among top publishers.

-Responsible for the day to day management and revenue growth of publisher partnerships at Epic Media Group.

-Optimized CPA campaigns.

**Publisher Partnerships, Affiliate Management**
Venture Direct Worldwide
January 2006 – December 2006 (1 year) | Greater New York City Area

-Specialized in the implementation and distribution of CPL / CPA campaigns for advertisers within the educational and financial sector.

**Recruiter**
Open System Technologies
January 2004 – December 2005 (2 years) | Greater New York City Area

-Recruiter of IT professionals related to top tier investment banking.

Skills

**Top Skills**

| | |
|---|---|
| 33 | Online Advertising |
| 32 | SEM |
| 25 | PPC |
| 20 | Online Marketing |
| 17 | Mobile Marketing |

Philip Lynch | LinkedIn                                file://///phl1nas2/JKrause070$/Personal/Leadnomics/Philip Lynch _ ...



Jovan Caputo

Dismiss — Only you can see your recent searches

Philip also knows about...

| | | | | | | |
|---|---|---|---|---|---|---|
| 9 | Social Media Marketing | 9 | Advertising | 9 | Mobile Advertising |
| 9 | Business Development | 8 | Media Planning | 8 | Lead Generation | 8 | SEO |
| 8 | Mobile Devices | 7 | Affiliate Management | 7 | New Business Development |
| 7 | Display Advertising | 6 | CPL | 6 | Online Lead Generation |
| 5 | Business Performance... | 4 | Contextual Advertising | | See 6+ |

Education

**Binghamton University**
B.A., Business / Marketing
2000 – 2004

Additional Info

• **Interests**

Investing, prospecting new business, snowboarding / surfing, any extreme sport related events.

Connections                                                Shared (6)

Stephen Gill  1st
Co-Founder @Tiller.com / AdTech / Entr...

David Graff  1st
Director, Global Product Policy

Shannon Milano, SHRM-CP  1st
Human Resources & Office Administratio...

Athas Nikolakakos  1st
Associate Principal, Global Product Polic...

Zach Robbins  1st
Fintech Entrepreneur | Customer Acquisi...

Julie Merritt Pacaro  1st
General Counsel at Leadnomics

Groups

**CPC Advertising Ass...**
477 members
Join

**Advertising Age**
136,128 members
Join

**Fashion E-Commerc...**
2,451 members
Join

**Affiliate Summit**
4,051 members
Join

7/20/2016 4:29 PM

Philip Lynch | LinkedIn                                    file://///phl1nas2/JKrause070$/Personal/Leadnomics/Philip Lynch _ ...



Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2016 | User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

# EXHIBIT 4

Jovan Caputo | LinkedIn

file://///phl1nas2/JKrause070$/Personal/Leadnomics/Jovan Caputo _...

Search for people, jobs, companies, and more...    Advanced

The Top Trial Lawyers - Million Dollar Advocates Forum. Since 1993. Are you qualified? | Read More »



# Jovan Caputo  2nd
## VP Sales and Distribution, Leadnomics Partner Network at Leadnomics

Greater New York City Area | Marketing and Advertising

| Previous | Leadnomics, Adsvehicle.com, Monetizelt |
|---|---|
| Education | Manhattan College |

[Connect]  [Send Jovan InMail] ▾

**500+** connections

https://www.linkedin.com/in/jovan-caputo-5342b18    Contact Info

## Background

   ### Summary

Specializes in ensuring maximum ROI for both publishers and advertisers by identifying profitable streams of revenue while diversifying the company's portfolio into new verticals.
Drive the overall strategy, manage the business development team, and focus on key publisher relationships for the Leadnomics Partner Network which consists of 50 + advertiser verticals across more than two thousand publisher partners.

   ### Experience

### VP Sales and Distribution, Leadnomics Partner Network
Leadnomics
May 2015 – Present (1 year 3 months)



Leadnomics is an online marketing company that generates millions of leads every year for financial institutions and insurance companies in the US and the UK. The company specializes in finding the right customers for clients by running highly targeted campaigns across a variety of online channels.

In 2012, Leadnomics was ranked #26 and #1 in Philadelphia on the Inc. 500 list, an annual ranking of the nation's fastest-growing privately held companies, up from #48 in 2011. In its sector, advertising & marketing, Leadnomics was ranked #3.
Director of Business Development –
Responsible for the Leadnomics Partner Network P&L, operations, and business initiatives between both publishers & advertisers.

### Director of Leadnomics Partner Network
Leadnomics
June 2013 – May 2015 (2 years)



Leadnomics is an online marketing company that generates millions of leads every year for financial institutions and insurance companies in the US and the UK. The company specializes in finding the right customers for clients by running highly targeted campaigns across a variety of online channels.

### Managing Partner
Adsvehicle.com
June 2012 – June 2013 (1 year 1 month) | Greater New York City Area

### Manager, Business Development
Monetizelt
July 2010 – June 2012 (2 years)

### Network Manager
AzoogleAds

---

### People Similar to Jovan



**Dan Hughes**  2nd
V.P. of Business Development at Path 56 Me...
Connect

### Ads You May Be Interested In

  **Go BIG to win!**
Personal Injury attorneys get 25% off all printing and mounting. Call!  ›

  **Cornell Master's in NYC**
Without Interrupting Your Career Weekend Classes for Professionals  ›

  **Wrongfully Terminated?**
Talk to an Employment Attorney today. We fight for employee rights.  ›

  **Zach Robbins**
Fintech Entrepreneur | Customer Acquisition Expert | Founder & CEO, Margo & Leadnomics

  **Josh Warner**
Digital Marketing | Product Management | Media Buying

  **Drew Johnson**
Business Development at Leadnomics

  **Dan Hughes**
V.P. of Business Development at Path 56 Media

  **Bona Daniel**
Affiliate Manager at DMi Partners

  **Joshua Irons**
Digital Marketing | Communications | Sales Enablement & Operations | Senior Leader

  **Avi Bleber**
Director of Business Development at ReviMedia

### Add new skills with these courses

  **Writing Ad Copy**
Viewers: 3,876

**Bing Ads Essential**
Training

Jovan Caputo | LinkedIn

file://///phl1nas2/JKrause070$/Personal/Leadnomics/Jovan Caputo _...



**Distribution Manager**
Epic Advertising
2007 -- June 2010 (3 years)

View more courses

**How You're Connected**

You

Athas Nikolakakos

Ask Athas for an introduction ›

See more connections in common

Jovan Caputo

**Skills**

**Top Skills**

| 38 | Affiliate Marketing |
| 31 | Online Marketing |
| 23 | Online Advertising |
| 20 | Lead Generation |
| 20 | Online Lead Generation |
| 19 | PPC |
| 17 | Email Marketing |
| 10 | Mobile Marketing |
| 6 | Affiliate Management |
| 6 | SEM |

**Jovan also knows about...**

| 4 | Ad Networks | 4 | Customer Acquisition | 4 | Media Buying | 4 | Mobile Advertising |
| 3 | E-commerce | 3 | Web Analytics | 3 | Advertising | 3 | Display Advertising |
| 3 | Business Development | 3 | Google Adwords | 3 | Conversion Optimization |
| 3 | Digital Strategy | 1 | CPL | 1 | Business Performance... |

**Education**

**Manhattan College**
BS, Marketing
2004 -- 2007
Activities and Societies: Soccer

**Manhattan College**
2003 -- 2007

**Additional Info**

• **Interests**

Soccer, snowboarding, surfing, guitar

**Recommendations**

2 of 4

7/20/2016 4:30 PM

Jovan Caputo | LinkedIn                                           file://///phl1nas2/JKrause070$/Personal/Leadnomics/Jovan Caputo _...

   Advanced     

**Jonathan Olson**
Managing Partner

❝ Jonathan is one of the smartest, most detail oriented partners with whom I have ever
done business. From Media Buying to SEM in a wide array of verticals, there are few that
get the job done better...

January 2, 2014, Jovan was with another company when working with Jonathan at Flow Logic LLC

 **John Marchionda**
Director of Partner Marketing

❝ John is a great guy! Extremely knowledgeable and always around to get things done...

September 10, 2013, Jovan was with another company when working with John at Media Crowd Inc

 **Jeremy Klein**
Director of Sales

❝ Jeremy is one of the most knowledgeable, and successful people I have met in this
industry. He works works hard, and always gets the job done...

October 3, 2012, Jovan worked with Jeremy at MediaWhiz Holdings LLC

---

**Connections**                                                         Shared (5)

 **Stephen Gill**  1st
Co-Founder @Tiller.com / AdTech / Entr...

 **Shannon Milano, SHRM-CP**  1st
Human Resources & Office Administratio...

 **Athas Nikolakakos**  1st
Associate Principal, Global Product Polic...

 **Zach Robbins**  1st
Fintech Entrepreneur | Customer Acquisi...

 **Julie Merritt Pacaro**  1st
General Counsel at Leadnomics

---

**Groups**







**Media Buyer & Selle...**
16,605 members
Join

**Chief Marketing Offic...**
237,266 members
Join

**Online All Stars**
617 members
Join

---

**Following**





**React2Media**
Online Media
Follow

**Leadnomics**
Marketing and
Advertising
Follow

**Schools**

Jovan Caputo | LinkedIn

file://///phl1nas2/JKrause070$/Personal/Leadnomics/Jovan Caputo _...

Advanced

**Manhattan College**
Greater New York City
Area
Follow

Help Center | About | Careers | Advertising | Talent Solutions | Sales Solutions | Small Business | Mobile | Language | **Upgrade Your Account**

LinkedIn Corporation © 2016 | User Agreement | Privacy Policy | Ad Choices | Community Guidelines | Cookie Policy | Copyright Policy | Send Feedback

7/20/2016 4:30 PM