IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| _____ | : | |
| AFFLUENT ADS, LLC, | : | |
| | : | |
| | : | Civ. A. No: _____ |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| JOVAN CAPUTO, PHILLIP LYNCH, | : | |
| and ADTELLIGENT MEDIA, LLC, | : | |
| | : | |
| Defendants. | : | |
| _____ | : | |

**MEMORANDUM OF LAW IN SUPPORT OF PLAINTIFF'S MOTION FOR
TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

Jonathan S. Krause
KLEHR HARRISON HARVEY &
BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA  19103
215-569-4496
jkrause@klehr.com


Counsel for Plaintiff
Affluent Ads, LLC

# TABLE OF CONTENTS

**Page**

I.   INTRODUCTION ........................................................................................ 1

II.  STATEMENT OF FACTS ......................................................................... 5

    A.   Affluent Ads Operates in a Highly Competitive Industry ..................... 5

    B.   Lynch And Caputo Join Affluent Ads in a Senior Managerial Capacity, Reporting Directly to Zachary Robbins, as CEO, and Enter into Non-Compete Agreements. ...................................................................... 11

    C.   Defendants Conspired to Form a Company to Compete with  Affluent Ads in the Winter of 2014 And 2015. ...................................................... 15

    D.   Affluent Ads Becomes Aware of Defendants' Misappropriation And Unlawful Competition When Investigating a Steep Decline in Revenue in LPN. .................................................................................................. 19

    E.   Affluent Ads Gave Defendants an Opportunity To Explain and Defend Their Actions But Received No Bona Fide Response, and Terminated Their Employment. ................................................................................ 20

III. ARGUMENT ............................................................................................. 21

    A.   Standard for Relief for a Preliminary Injunction ................................. 21

    B.   A Preliminary Injunction Is Necessary And Appropriate. ................... 21

        1.   Affluent Ads Is Likely To Succeed on the Merits of Its Claims for Injunctive Relief. ........................................................................ 21

        2.   Affluent Ads Will Suffer Irreparable Harm Absent Injunctive Relief. ........................................................................................... 28

        3.   Defendants Will Not Suffer Irreparable Harm If An Injunction Is Issued. ......................................................................................... 30

        4.   Injunctive Relief Is in the Public Interest ................................... 31

    C.   The Court Should Issue A Temporary Restraining Order To Prevent Immediate Irreparable Harm To Affluent Ads Pending a Prompt Hearing on the Motion for a Preliminary Injunction. ......................................... 31

        1.   Irreparable Harm Will Result if Relief Is Delayed ................... 32

        2.   Additional Notice Is Not Required ............................................ 32

IV.  CONCLUSION .......................................................................................... 33

# TABLE OF AUTHORITIES

**Page(s)**

CASES

A.M. Skier Agency v. Gold,
    747 A.2d 936 (Pa. Super. 1989) ....................................................................................24

Air Prods. & Chem., Inc. v. Johnson,
    442 A. 2d 1114 (1982) ...................................................................................................24

American Greetings Corp. v. Dan-Dee Imports, Inc.,
    807 F.2d 1136 (3d Cir. 1986) .......................................................................................31

Bilec v. Auburn & Assoc., Inc. Pension Trust,
    588 A. 2d 538 (Pa. Super. 1991) ..................................................................................27

Blair Design & Construction Co. v. Kalimon,
    530 A. 2d 1357 (Pa. Super. 1987) ................................................................................28

Chmura v. Deegan,
    398 Pa. Super. 532 (Pa. Super. 1990) .........................................................................29

Coventry First, LLC v. Ingrassia,
    No. 05-2802, 2005 WL 1625042 (E.D. Pa. July 11, 2005) ........................................28

DeMuth v. Miller,
    652 A. 2d 891 (Pa. Super. 1995) ..................................................................................28

Den-Tal-Ez, Inc. v. Siemens Capital Corp.,
    566 A. 2d 1214 (Pa. Super. 1989) ................................................................................24

Ecolaire Inc. v. Crissman,
    542 F. Supp. 196 (E.D. Pa. 1982) ...............................................................................29

Emergency Care Research Inst. v. Guidant Corp.,
    No. 06-1898, 2007 WL 2702455 (E.D. Pa. Sept. 12, 2007) ...............................22-23

Fisher Bioservices, Inc. v. Bilcare, Inc.,
    No. 06-567, 2006 WL 1517382 (E.D. Pa. May 31, 2006) ....................................29, 31

Geisinger Clinic v. DiCuccio,
    606 A. 2d 509 (Pa. Super. 1992) ..................................................................................28

Graphic Mgmt. Assoc., Inc. v. Honegger,
    No. 94-0825, 1994 WL 59369 (E.D. Pa. Feb. 25, 1994) ...........................................31

## TABLE OF AUTHORITIES
### (continued)

Hess v. Gebhard & Co.,
 808 A. 2d 912 (Pa. 2002) ................................................................. 26-27

John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc.,
 369 A. 2d 1164 (Pa. 1977) ................................................................26, 28

National Bus. Servs., Inc. v. Wright,
 2 F. Supp. 2d 701 (E.D. Pa. 1998) .........................................................28

Omicron Systems, Inc. v. Weiner,
 860 A. 2d 554 (Pa. Super Ct. 2004) ......................................................24

Opticians Ass'n of Am. v. Independent Opticians of Am.,
 920 F.2d 187 (3d Cir. 1990) ..................................................................21

Pappan Enters., Inc. v. Hardee's Food Sys., Inc.,
 143 F.3d 800 (3d Cir. 1998) ..................................................................29

Pestco, Inc. v. Assoc. Prods., Inc.,
 880 A. 2d 700 (Pa. Super. 2005) ...........................................................23

Piercing Pagoda v. Hoffner,
 351 A. 2d 207 (Pa. 1976) .......................................................................28

Quaker Chem. v. Varga,
 509 F. Supp 2d 469,476 (E.D. Pa. 2007) ..............................................28

SI Handling Sys., Inc. v. Heisley,
 753 F.2d 1244 (3d Cir. 1985) ...........................................................23, 29

Sidco Paper Co v. Aaron,
 351 A. 2d 250 (Pa. 1976) .......................................................................26

Siemens Building Technologies, Inc. v. Camacho,
 168 F. Supp. 2d 425 (E.D. Pa. 2001) ....................................................31

Thermo-Guard, Inc. v. Cohran,
 596 A. 2d 188 (Pa. Super. 1991) ...........................................................26

Union Carbide Corp. v. UGI Corp.,
 731 F.2d 1186 (5th Cir. 1984) ...............................................................29

Wellspan Health v. Bayliss,
 869 A. 2d 990 (Pa. Super. 2005) ...........................................................26

## TABLE OF AUTHORITIES
### (continued)

**Page**

Worldwide Auditing Servs., Inc. v. Richter,
   587 A.2d 772 (Pa. Super. 1991)..................................................................................27

**STATUTES**

12 Pa.C.S. § 5302.......................................................................................................22

12 Pa.C.S. § 5303.......................................................................................................22

18 U.S.C. § 1832.........................................................................................................22

18 U.S.C. § 1839.........................................................................................................22

**OTHER AUTHORITIES**

Federal Rule of Civil Procedure 65(a) ..........................................................5, 21, 33

Federal Rule of Civil Procedure 65(b) .......................................................... 5, 32-33

Plaintiff Affluent Ads, LLC ("Plaintiff," "Affluent Ads," or "the Company") respectfully submits this Memorandum of Law in support of its Motion for a Temporary Restraining Order and for a Preliminary Injunction compelling its former senior managerial employees Jovan Caputo ("Caputo") and Phillip Lynch ("Lynch") (Caputo and Lynch, collectively, the "Individual Defendants"), and a company they created called Adtelligent Media, LLC ("Adtelligent") (collectively, "Defendants"), to: (1) refrain from further disclosing or using Affluent Ads' trade secrets, proprietary business, or confidential information; (2) cease performing services in unlawful competition with Affluent Ads, including ceasing services and communications with Affluent Ads' former, current, or prospective Client or Publishers and not attending Internet marketing trade shows; (3) return all of Affluent Ads' business information in their possession and produce copies of all Company documents in expedited discovery; (4) respond to expedited discovery sought by Affluent Ads' in furtherance of this Motion; and (5) preserve and not delete, destroy, modify, or otherwise alter all documents and information, in whatever form, that may be relevant to this action.

## I.   <u>INTRODUCTION</u>

This litigation is necessary because the Individual Defendants chose to compete unlawfully with their employer, Affluent Ads, by operating a directly competitive business  while still employed by the Company.  Exacerbating their misconduct, Defendants misappropriated and relied upon  Affluent Ads' trade secrets and confidential information to conduct their unlawful enterprise.  Rather than be content with their substantial compensation and responsibilities running a multi-million dollar business unit (or take legal steps if they were not content to pursue other opportunities), the Individual Defendants chose to use Affluent Ads' proprietary information to operate Adtelligent and otherwise compete with their employer, and to use their position of trust to outright funnel money from clients intended to pay Affluent Ads for its services into a separate bank account they set up for themselves.  This is textbook unlawful conduct that must be halted through immediate injunctive relief.

1

Affluent Ads is an on-line marketing and lead generation company.  Its clients are companies that sell their goods and services with the assistance of advertising and marketing companies, including companies like Affluent Ads that offer these services on  the Internet ("Clients," also referred to as "Advertisers"), such as auto insurance companies,  financial institutions offering mortgage refinancing, and solar energy providers.  Affluent Ads supports its Clients' online marketing efforts by helping direct consumers to Client websites and customer service representatives to learn more about the Client and potentially purchase the Client's goods or services.  One way Affluent Ads provides this marketing support is by partnering with its Publishers (also referred to as "Affiliates").  Publishers are independent agents that specialize in getting on-line consumers to Clients' websites and customer service representatives through their ability to identify and utilize on-line media space for advertising purposes. Affluent Ads contracts with specific Publishers to support the advertising campaigns of Clients who have contracted with the Company through the Company's LPN Network ("LPN").

The Individual Defendants were senior managers, reporting directly to the Chief Executive Officer, and were responsible for LPN from June 4, 2013 until their employments were terminated on July 14, 2016.  While serving in this role, they gained deep knowledge as to the identity of the Company's Publishers; which Publishers were most effective and at which types of campaigns; the contractual – including economic – terms of the Company's Publisher relationships; and the strategies used by the Company to cultivate stronger Publisher relationships, and they also developed relationships with Publishers whom they would not know but for their employment.  The Individual Defendants also developed deep knowledge as to Clients' on-line marketing needs; the contractual – including economic – terms of the Company's relationships with its Client; and the strategies used by the Company to cultivate stronger Client relationships, and they also developed relationships with Clients  who would not otherwise know them, and would not likely have agreed to work them but for their employment at

this sizeable, well-established, trusted Company in the industry.  In addition, befitting their senior status, the Individual Defendants attended high-level strategy meetings weekly, at which potential marketing initiatives, new client industries to target, and other sensitive information was disclosed.  This information constitutes some of Affluent Ads' most sensitive trade secrets and confidential information, to which very few Company employees -- let alone competitors --  had access or knowledge.

At some point relatively early during their employment at Affluent Ads, Caputo and Lynch decided to take advantage of the Company's size, good will, and trade secrets to compete directly against it, by forming and then operating Adtelligent and through other means.  As Affluent Ads has come to learn, Defendants then proceeded to conduct business with the Company's Clients, using the Company's resources  and  Publishers, for their own benefit rather than for the benefit of their employer. Caputo and Lynch engaged in this brazen and unlawful competition through several means:  on their own; through a newly formed company, Adtelligent; and, it is believed, also through, directly as individuals without use of a company name, or using other names such as 925Media or Blue Mule. Caputo and Lynch made this extraordinary decision despite the obvious conflict of interest and the fact that they entered into Non-Compete Agreements as conditions of their employment, which precluded them from disclosing or using Affluent Ads confidential information for any entity but Affluent Ads, from competing with Affluent Ads during their employment and for a limited time after, and from soliciting Affluent Ads' Publishers and Clients during their employment and for a limited time thereafter.  In contravention of the law and ethical business practices, they concurrently ran LPN and operated a directly competitive company and enterprise.

In addition to competing unlawfully with Affluent Ads, Defendants' scheme also apparently included outright theft.  Specifically, Affluent Ads understands that Defendants informed Clients that certain payments for work performed by the Company should be directed to a separate bank account,

which in fact was controlled and maintained by Defendants.  Under this part of the scheme, Clients thought they were making payments to Affluent Ads, when in fact the money went to Defendants. Defendants appear to have covered their tracks with Affluent Ads by claiming that some of the work performed for a Client was non-compensable because it did not produce the necessary type of consumer traffic, therefore deceiving their employer and allowing them to retain unjustly the money.  Tellingly, this new bank account Defendants set up was at J.P. Morgan Chase & Co. ("Chase"), the same bank used by Affluent Ads, so that Clients would think the payments sent to Defendants' accounts were going to a different, Affluent Ads-owned account.

While Defendants apparently had been operating Adtelligent and competing against Affluent Ads since Winter 2014/2015, it was only in early July 2016 that the Company became aware of their malfeasance.  In response to a substantially and sudden decrease in LPN revenue and loss of key Clients, Affluent Ads investigated LPN and learned of Adtelligent's existence and some of Defendants' misconduct.  Affluent Ads directly confronted the Individual Defendants at an in-person meeting, and offered them an opportunity to come clean as to their conduct and cure the harm caused.  In response, the Individual Defendants refused to engage in any meaningful dialogue, left the meeting (at which their employment was also terminated), and represented that Affluent Ads would be hearing shortly from them or counsel.  As of this filing, Affluent Ads has received no further communication from Defendants or those acting on their behalf.

Affluent Ads only recently became aware of Defendants' misappropriation of its trade secrets and confidential information and violation of their restrictive covenant obligations as a result of its investigation.   Affluent Ads' investigation is ongoing and would be substantially aided by expedited discovery in this action.  Based on Defendants' own internal discussions about the amount of revenue they were diverting, Affluent Ads estimates that hundreds of thousands of dollars have been funneled to

4

Defendants through a combination of their outright competing with Affluent Ads and directing Clients to send a portion of Affluent Ads-intended payments to their Chase account.  Absent relief, Defendants will continue their unlawful scheme today.  The facts that it has ascertained so far, provide ample support for at least an immediate *ex parte* temporary restraining order pursuant to Federal Rule of Civil Procedure 65(b), pending a prompt evidentiary hearing on its Motion for a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65(a) at which Defendants can defend their conduct, if they can.  Absent that relief, as set forth below, the Company will suffer irreparable harm.

## II.    STATEMENT OF FACTS

### A.    Affluent Ads Operates in a Highly Competitive Industry

Affluent Ads is an online marketing and lead generation company, which runs highly targeted advertising campaigns for its Clients across multiple online channels.  (Declaration of Zachary Robbins ("Robbins Decl.") at ¶ 3).  Affluent Ads also generates customer leads for its clients using proprietary technology and processes. (Id.)  Affluent Ads' Clients, also known as "Advertisers," are companies who seek to use Internet advertising to help sell their goods and services.  (Id. at ¶ 4.)  Some of the key industries of the Clients that rely upon Affluent Ads include financial institutions focusing on mortgage refinancing and other loans, auto insurance companies, and providers of solar energy and consumer goods, located throughout the United States of America and also, in some cases, in the United Kingdom and elsewhere around the world.  (Id.)

One of Affluent Ads' largest lines of business is its Affluent Ads Partner Network ("LPN," the division run by Caputo and Lynch until their employment termination.  (Id. at ¶ 5.)  Through LPN, Affluent Ads' Clients contract with the Company to drive consumers who the Clients hope to convert into customers to Client websites and customer service representatives in order to increase the likelihood that they will purchase Client goods or services.  (Id.)  For example, an auto insurance company will

rely upon Affluent Ads to help it locate potential customers in a geographic area and income range.  (Id.)
These Clients rely upon Affluent Ads because of its reputation for identifying high quality consumers
most likely to present the Client with opportunities to generate new business, its reputation for being
able to get such consumers to Clients' sites and customer service representatives, and its reputation for
doing so through ethical business practices.  (Id.)

In order to service its Clients, Affluent Ads' LPN division relies upon and contracts with
partners, known as "Publishers" or "Affiliates," who specialize in directing online consumers to Clients
to buy their goods and services.  (Id. at ¶ 6)  Some of LPN's Publishers are owners and operators of
websites and other electronic mediums offering online media space for ad placement; the remainder are
adept media buyers who are skilled at identifying online media space opportunities and placing ads to
successfully direct business to Clients.  (Id.)  LPN provides its network of advertising campaigns from
various Clients for the Publisher to choose from, and compensates the Publisher based on the customer
traffic its Clients gain from the Publisher's efforts.  (Id.)  Using the auto insurance example, LPN, on
behalf of the auto insurance client, would turn to its Publisher network to use their expertise in directing
new potential customers to the Client to increase the chance that potential customers purchase auto
insurance from the Client, and Publishers would then be compensated by LPN based on their ability to
drive traffic to LPN's Client.  (Id.)

In addition to its LPN division, Affluent Ads has a lead generation division, which works
directly with Clients and lead aggregators to provide clients with high-quality, pre-qualified leads at
auction through its dynamic bidding platform.  (Id. at ¶ 7.)  Affluent Ads' lead generation business
builds and operates websites to help consumers find quotes for goods and services offered by its Clients
(such as auto insurance, mortgage refinancing, solar panels, and consumer goods);  the Company has
consumers complete an online form about their specific consumer needs, and then matches the consumer

and his or her needs with one or more  Clients offering the desired good or service.  (Id.)  The Clients, in

turn, pay Affluent Ads for matching them with the consumer, as a potential customer.  (Id.)

   The online affiliate marketing industry is extremely competitive, particularly concerning the

knowledge of and relationships with Clients and the Publishers skilled at driving on-line consumers to

Clients. (Id. at ¶ 8.)  Affluent Ads' development of its Publisher network, and the terms of its

relationships with specific Publishers, have come at a tremendous investment of money and resources.

(Id.)  Unfortunately, in the online affiliate marketing industry, there are numerous Publishers who

generate fraudulent traffic by, among other means, artificially manufacturing facially high consumer

traffic by relying on automated programs that give the appearance of high human traffic (known as

"bots") or manually clicking on a Client site repeatedly.  (Id.)  In addition, there are Publishers who are

not effective at targeting consumers based on specific Client needs.  (Id.)  The use of Publishers

generating fraudulent traffic and Publishers who are ineffective, result in unsuccessful marketing

campaigns for Clients.  (Id.)  Consequently, relationships with Publishers that produce successful

marketing campaigns are closely guarded secrets as highly sensitive competitive information. (Id.)  In

the industry, when Publishers direct "bad" traffic to Clients, Clients will not pay for such traffic.  (Id.)

While a certain level of bad traffic for which no compensation is given is accepted (this is referred to as

"scrubbed" traffic), high levels will result in Client loss of confidence in Affluent Ads which will cause

Clients to look elsewhere for their online marketing needs.  (Id.)  The identity, contact information, and

other details of an industry member's working relationship with Publishers is not available through

websites, public resources such as government records, or other means.  (Id.)  Affluent Ads, through its

industry experience and investment in resources, has developed relationships with Publishers and come

to learn which of these Publishers can be relied upon for effective and ethical business, which in turn has

allowed Affluent Ads' Clients to rely upon it to provide highly successful marketing support.  (Id.)  This

knowledge of Publisher identity, information, and quality is a pivotal trade secret, not disclosed to third-parties or even those without a need to know within the Company, and gives Affluent Ads a decided competitive advantage over its competition.  (Id.)

In addition, Affluent Ads' contractual terms with its Publishers, including pricing, margin, and payment frequency information, are closely kept trade secrets.  (Id. at ¶ 9.)  As Publishers are independent agents, online marketing companies retain Publishers only through providing competitive compensation.  (Id.)  A Publisher is compensated by the quantity of customers visiting a website that take some form of action towards becoming a customer of the Client.  (Id.)  The actions by a customer for which compensation can be earned range from viewing an ad all the way to purchasing a good or service from a Client.  (Id.)  If a competitor were to know Affluent Ads' contract terms with Publishers, including pricing information, they could use that knowledge to calculate Affluent Ads' profit margin and undercut Affluent Ads' terms.  (Id.)  Affluent Ads could not likely continue as a successful company if its Publisher relationships and pricing information could just be usurped by a competitor. (Id.)

Similarly, Affluent Ads has invested significant amount of money and resources in developing Client lists and relationships with Clients such that it understands their specifications, has earned their trust, and can most effectively provide for their online marketing needs.  (Id. at ¶ 10)  Affluent Ads' Client relationships and the contractual terms with Clients are highly confidential trade secrets that are not publicly available.  (Id.)  The Company's pricing terms with its Clients is highly competitive information which, particularly in conjunction with the terms negotiated with its Publishers, determine the profitability of Affluent Ads.  (Id.)  As with its Publishers, Affluent Ads could not likely continue as a successful company if its Client relationships and pricing information could just be usurped by a competitor.  (Id.)  Moreover, Affluent Ads' viability would be greatly harmed if competitors could

8

simply trade off the good will its high quality services have generated with Clients by representing their services as the Company's.   (Id.)

Befitting their senior level, the Individual Defendants also had deep knowledge of and access to Affluent Ads' strategic business information.  (Id. at ¶ 11)  The Individual Defendants were two of approximately five Affluent Ads leaders who attended weekly management meetings where high level and confidential information would be discussed.  (Id.)  Specifically, at these leadership meetings, the Individual Defendants and others would gain understanding as to what strategic efforts are effective (and, just as importantly, what are not effective and why they are not effective), the evaluation of certain Publishers and why certain of them are integral to the success of the Company, and the evaluation of key Clients and strategic ways to strengthen those relationships. (Id.)  In addition, the Individual Defendants knew Affluent Ads' macro-level strategic information, including where and why investments of resources were made (whether that be by business unit, industry vertical or otherwise), the effectiveness of such investments, and which industries Affluent Ads believed there to be growth opportunities and how the Company would go about seizing that opportunity.  (Id.)

In support of its business, Affluent Ads has invested millions of dollars and thousands of hours of time developing Client and Publisher relationships and knowledge, proprietary technology, and proprietary know-how.  (Id. at ¶ 12.)  Due to the competitive nature of the business and the considerable effort and expense devoted by Affluent Ads to developing its trade secrets and confidential information, Affluent Ads takes appropriate steps to protect its trade secrets and confidential information from unauthorized disclosure by restricting access to employees who have a legitimate need for the information.  (Id. at ¶ 13.)

Affluent Ads requires all employees to enter into agreements the same as or similar to the Invention, Non-Disclosure, and Non-Competition Agreement (the "Non-Compete Agreement" or

"Agreement") that the Individual Defendants signed as a condition of their employment.[1]  (Id. at ¶ 14.)

These forms of agreement have strong non-disclosure prohibitions and contain post-employment restrictive covenants intended to preserve trade secrets and confidential information, including the good will and relationships, that Affluent Ads has developed. (Id.)

Affluent Ads also has in place clear policies, including its Communication and Technology Use Policy, to protect its trade secrets and confidential information and to limit access to its computers and property for authorized purposes only.  (Id. at ¶ 15.)  For example, Affluent Ads' employees and contractors must login to Affluent Ads' secure computer network using unique login credentials.  (Id.) As part of the employee log-in process for email and internal dashboard access,[2] Affluent Ads requires Google Authenticator two-step verification.  (Id. at ¶ 16.)  This means, when logging into a new device for the first time to access email or an internal dashboard, the user not only has to enter the accurate and restricted password but must also enter a randomized series of numbers sent via text to a pre-assigned cell phone for the user before access is granted.  (Id.).

Affluent Ads also restricts access to its Client and Publisher information to the employees who need access to such information to perform their job duties, and not all employees in the Company can access such information.  (Id. at ¶ 17.)  For dashboard access, Affluent Ads restricts within the Company to the information contained therein to operations and business development employees who need the access to perform their job duties and who make up no more than 20% of Affluent Ads' workforce. (Id.)  Affluent Ads imposes such internal restrictions because of the sensitivity of the information. (Id.)

---

[1]         A true and correct copy of the Caputo Non-Compete Agreement is attached as Exhibit 1 to the Robbins Decl. and a true and correct copy of the Lynch Non-Compete Agreement is attached as Exhibit 2 to the Robbins Decl.
[2]         Dashboards are where authorized Affluent Ads' employees can access sensitive information, such as revenue reporting, tracked Client information and performance, and Publisher information and performance.

In addition, most employee work computers are Apple manufactured, with File Vault II installed. (Id. at ¶ 18.)  This means that if a work computer is stolen or misplaced, nobody can access the files on the computer unless then enter a 16 digit recovery key code or know the individualized password for that particular computer.  (Id.)  Indicative of the efforts taken by Affluent Ads to protect its information, this is the same encryption tools used by NASA to protect its sensitive information.  (Id.)  Affluent Ads' offices also are restricted such that third-parties cannot simply enter and gain access to the office, let alone the Company's business information.  (Id. at ¶ 19.)

In addition, Affluent Ads does not disclose Client or Publisher information to other actual or prospective Clients or Publishers.  (Id. at ¶ 20.)  Even were a significant Client to insist on knowing the identity of Affluent Ads' Publishers, the Company would not consider providing the identity, let alone any other confidential information regarding that relationship.  (Id.)  If a competitor were to know Affluent Ads' Client and Publisher relationships, as well as the contractual terms of those relationships, including the terms of compensation and the effectiveness of certain Publishers, it would have a substantial and unfair advantage when obtaining work from and providing services to Clients, with the ability, among other things, to undercut Affluent Ads business in the marketplace.  (Id. at ¶ 21.)

**B.      Lynch And Caputo Join Affluent Ads in a Senior Managerial Capacity, Reporting Directly to Zachary Robbins, as CEO, and Enter into Non-Compete Agreements.**

Affluent Ads hired Lynch and Caputo as employees on or about June 4, 2013.  (Id. at ¶ 22.)  At hire, both Lynch and Caputo held the position of Co-Director for Partner Network Operations, reporting directly to CEO Zachary Robbins ("Robbins").[3]  (Id.)  In that capacity, they ran LPN, a multi-million dollar business unit, and managed several employees.  (Id.)

---

[3]      In May 2015, Caputo's title changed to Vice-President, Sales and Distribution, for LPN and Lynch's changed to Vice-President, Business Development and Operations, for LPN, but their material duties and overall responsibility for LPN remained the same throughout their employment.

Affluent Ads explicitly informed the Individual Defendants of their obligations to the Company upon hire and required them to enter into contractual agreements to protect Company trade secrets and confidential information.  (Id. at ¶ 24.)  The Offer Letter made clear that, except for limited wind-down work for a prior company that is unrelated to the facts giving rise to this action, "[t]his is a full time position.  (Id.).  During the period of employment hereunder…you shall devote your full business time, ability and attention to the business of the Company, and you shall not engage in or perform duties for any other person that interfere with the performance of your duties hereunder."  (Id.)  The Offer Letter further provided that employment was contingent upon the Individual Defendants' execution of the restrictive covenant agreement that was enclosed with the Offer Letter.  (Id.)  Both Lynch and Caputo agreed to the terms of employment, signing the Offer Letter.  (Id.)  True and correct copies of Caputo's and Lynch's Offer Letters are attached as Exhibits 3 and 4 to the Robbins Decl., respectively.  (Id.).

Lynch and Caputo also signed their respective Non-Compete Agreements, which were enclosed with the Offer Letter, and which contained non-disclosure, non-solicit, and non-competition obligations. (Id. at ¶ 24.)  By entering into the Non-Compete Agreement, Lynch and Caputo agreed:

a.   Not to "disclose any Confidential Information to any person or entity other than employees of Company or other persons providing services of the Company or use the same for any purposes (other than in the performance of his/her duties providing services to Company) without written approval by an officer of Company, either while performing services or at any time thereafter." (Ex. 1 to Robbins Decl., the Non-Compete Agreement, § 1.1);

b.   Not to contact or communicate with Clients for "[a]s long as he is rendering services to Company and for a period of one (1) year thereafter…with the purpose or effect of (i) interfering with Company's relationship with or sales of any products or services to such customer or Advertiser or (ii) providing, selling, or attempting to sell any products or services from an entity or person other than

Company, where such products or services are of the type offered for sale or provided by Company while Employee was employed by Company and specifically including (a) providing, selling or attempting to sell Leads for any industry that Company purchased or sold Leads during the above-mentioned restriction period (such as, but not limited to short-term consumer loan, payday loan, and auto-insurance industries), (b) providing or selling Internet Traffic or inventory space or Internet traffic to any such [Client]; and (c) selling advertising inventory space or Internet traffic to any such [Client]…" (Id., § 3.2);[4]

  c. Not to contact or communicate with Publishers for "[a]s long as he is rendering services to Company and for a period of one (1) year thereafter…with the purpose or effect of (i) purchasing online media, advertising space, Internet Traffic, or Leads from such Publisher; (ii) promoting through any online means advertisements, products or services through such Publisher; (iii) compensating such Publisher for online advertising services; or (iv) interfering with Company's relationship with such Publisher or inducing or causing such Publisher to terminate or reduce his/her/its relationship with Company…" (Id., § 3.3);[5]

  d. Not to solicit suppliers during employment or for a one year period thereafter (Id., § 3.4);

  e. Not to solicit employees during employment or for a two year period thereafter (Id., § 3.5);

  f. Not to participate for "as long as he is rendering services to Company and for a period of six (6) months thereafter…in any…business or entity that….(a) engages in affiliate marketing, where Internet Traffic is purchased or generated, such as but not limited to through websites, emails, or by displaying online advertisements, in a manner designed to sell it to a particular third-party, which compensation based on performance…, or (b) engage in conduct in preparation of providing any of the

---

[4] The temporal restriction for (ii) is limited to six months under certain circumstances.
[5] The temporal restriction for (ii) is limited to six months under certain circumstances.

products or services specified in (a) during the restricted period." (Id., § 4.1); and

      g.  Not to compete with Affluent Ads for a one-year period in any area of the business besides the six-month restriction described in Section 3.6.  (Id., § 4.2.)

(Id.)

      Caputo and Lynch shared responsibilities for running Affluent Ads' LPN division.  (Id. at ¶ 25.) As Lynch explains on his LinkedIn page, the Individual Defendants' job duties included:

      a.  Responsibility for [LPN] P&L, operations and business initiatives between both publishers and advertisers;

      b.  Ensure maximum ROI [return on investment] for both publishers and advertisers by identifying profitable streams of revenue while diversifying the company's portfolio into new verticals;

      c.  Manage the overall strategy, business development team and key publisher relationships for [LPN] which consists of almost 50 advertiser verticals across more than two thousand publisher partners.[6]

(Id.)

      In connection with these significant responsibilities, Caputo and Lynch had exposure to Affluent Ads' most valuable trade secrets and confidential information, including its assessment of specific Publisher and Client relationships, key contacts at Publishers and Clients, and the contractual and economic terms of Affluent Ads' relationships with Publishers and Clients.  (Id. at ¶ 26.)  Indeed, a significant part of the Individual Defendants' job responsibilities consisted in negotiating agreements with Publishers and Clients, strengthening Affluent Ads' pre-existing relationships, and identifying new

---

[6]     Caputo also identifies in his LinkedIn profile that he was "[r]esponsible for [LPN] P&L, operations, and business initiatives between both publishers & advertisers."  True and correct copies of Lynch's and Caputo's LinkedIn profiles, last viewed on July 18, 2016, are attached to the Robbins Decl. at Exhibits 5 and 6.

business opportunities for LPN.  (Id.)  The Individual Defendants were highly compensated for performing their job duties.  (Id. at ¶ 27)

C.    **Defendants Conspired to Form a Company to Compete with Affluent Ads in the Winter of 2014 And 2015.**

Unbeknownst to Affluent Ads at the time, in or about November 2014, Caputo and Lynch entered into an agreement to form a new business that would compete directly with Affluent Ads while they remained wage-earning employees of the Company.  (Id. at ¶ 28.)  On November 24, 2014, Caputo wrote to Lynch:  "adtelligent[,] but yes[,] I am down[,] and I know[,] thats the best thing for us[,] the timeline we discussed[,] please don't say anything stupid[.]"  (Id. at ¶ 29.)  A true and correct copy of this communication is attached to the Robbins Decl. at Exhibit 7.  (Id.)

On or about February 5, 2015, in furtherance of their agreement to knowing, unlawfully compete, Caputo and Lynch formed Defendant Adtelligent Media, LLC.  (Id. at ¶ 30.)  The business address it registered with the New York Department of State is 92 Broadway, Suite 4, Amityville, New York  11701, the publicly identified business address for the Ansanelli Law Group, where one or more of Caputo's relatives practice law.  (Id.)  The New York Department of State, Division of Corporations' Entity Information also identifies Lynch on the address information for Adtelligent.  (Id.)  A true and correct copy of the NYS Department of State, Division of Corporations, Entity Information for Adtelligent is attached to the Robbins Decl. at Exhibit 8.  (Id.)  Defendants also conducted business in competition with Affluent Ads using the names 925Media and/or Blue Mule, or by just performing competitive activities as individuals without the use of any business name or entity structure.  (Id. at ¶ 31.)

In furtherance of their agreement to unlawfully compete, Caputo and Lynch set up a bank account with JP Morgan Chase & Co. ("Chase"), which is the same banking institution used by Affluent Ads.  (Id. at ¶ 32.)  The bank account number for this account is #[XXXX]1802 (the "Chase Account").

15

(Id.)  In an effort to conceal their illicit conduct, Individual Defendants chose to bank with Chase for the purpose of leading Affluent Ads' Clients to believe that the new account was an Affluent Ads' account to which some payments should be directed and, by choosing the same banking institution that Affluent Ads had previously provided to Clients for payment purposes, this false story would be considered more plausible by unsuspecting Clients.  (Id.)

Starting in November 2014 and continuing to present, the Individual Defendants used Adtelligent to perform work for Clients for their own benefit and not on behalf of Affluent Ads.  (Id. at ¶ 33.)  Caputo and Lynch did not inform Affluent Ads of the business opportunities they took for their own benefit.  (Id.)  Caputo and Lynch performed this work for their own benefit while they remained active, paid employees of Affluent Ads.  (Id.)

Additionally, beginning in November 2014 and continuing to present, Caputo and Lynch entered into an agreement to misappropriate Affluent Ads' trade secrets, confidential information, good will, property and resources for their own benefit.  (Id. at ¶ 34.)  Caputo and Lynch likely concluded that it would be substantially cheaper and easier for Adtelligent to succeed if they took Affluent Ads property, resources, and relationships for their own benefit, instead of having to invest the time and resources to develop Client and Publisher relationships, business documents, pricing models, and strategic plans of their own for Adtelligent.  (Id.)  At the time that the Individual Defendants agreed to take Affluent Ads' property, resources and relationships, including its trade secrets, confidential information, and good will, they knew that they did not have authority to access or use this information, resources, and material for their own benefit.  (Id.)  The Individual Defendants never disclosed to Affluent Ads their purpose for accessing or taking these items because they knew that Affluent Ads would not authorize such access or use.  (Id.)

For example, Caputo and Lynch used the Company's computers that they were authorized to use for legitimate Affluent Ads business purposes to instead develop and run Adtelligent's business.  (Id. at ¶ 35.)  The Individual Defendants did not have authority to use these computers for the purpose of using Affluent Ads' confidential information, trade secrets, and good will for their own benefit.  (Id.)  The Individual Defendants also did not have authority to use these computers for the purpose of creating or editing Adtelligent documents, yet – despite this lack of authority – had a folder on their Affluent Ads' work computers dedicated to Adtelligent business.  (Id.)

In furtherance of their conspiracy, Defendants used Affluent Ads' own campaign tracking platform, Cake (www.getcake.com), as well as several other third-party tracking platforms, including among others, HasOffers (www.hasoffers.com) and Limelight (https://www.limelightcrm.com), to support their unlawful scheme.  (Id. at ¶ 36.)  Defendants appear to have used Cake, HasOffers, Limelight, and/or other tracking platforms to track  Publisher and Advertiser business activity for their own benefit, rather than for the benefit of Affluent Ads.  (Id.)

In addition to marketing themselves to Clients as Adtelligent, the Individual Defendants also directed Affluent Ads' Clients to send payments intended for Affluent Ads to Adtelligent's Chase Account.  (Id. at ¶ 37.)  As this part of their scheme, the Individual Defendants would inaccurately cause Affluent Ads' records to identify approximately 10% of the work generated for certain Clients as "scrubbed" traffic, i.e., not traffic chargeable to the Clients because it was bad customer traffic for one or more reasons -- such as because it was fraudulent traffic (for example, automated click traffic caused by bots or by multiple manual clicks by one individual from the same IP address, intended to exaggerate customer flow) or was mismatched traffic (for example, a mortgage refinance customer who, as it turns out, does not own a home), etc. -- and then have Clients send payment for that 10% "scrubbed" (bad) traffic to their Adtelligent Chase Account.  (Id.)  In reality, the 10% scrubbed traffic was fully

chargeable and, in fact, was charged to the Clients, who paid the amount into Defendants' Chase

Account with the mistaken understanding that it was being sent to an Affluent Ads bank account.  (Id.)

As the Individual Defendants explained in a March 20, 2015 communication:

> Lynch:  the scrub on reverse[] doesn't work[] unless they do volume
> Caputo:  sure
> Lynch:  you can't scrub 5 leads
> Caputo:  true[,] got it[,] gotta see whats up w this shit
> **Lynch:  its got to be like 100 – then 10 would be scrubbed…maybe**
> Caputo:  got it[,] call now we got
> **Lynch: its one out of 10 leads[] at 10 percent[,] number - #[xxxx]1802[,] all the other info he has is still accurate – he just needs to switch the acct number out**
> Caputo:  I shouldn't give him the new address?
> Lynch:  nah[,] its fine
> Caputo:  ok
> **Lynch:  all it needs is bank acct[] and routing which he has[,] its literally just a switch of the acct number and all good**
> **Caputo:  kk cool[,] Ill get that done[.]**

(Id.) (emphasis added)  A true and correct copy of this communication is attached to the Robbins Decl.

at Exhibit 9.

Defendants' unlawful scheme was not limited to competing unlawfully through Adtelligent or by

diverting payments intended for Affluent Ads into their Chase Account.  (Id. at ¶ 38).  Although its

investigation is ongoing and the Individual Defendants have refused to disclose the scope of their

malfeasance, Affluent Ads understands that the Individual Defendants also competed directly as

individuals and generated sales for their own benefit without using Adtelligent.  (Id.)  Based on this

understanding, the Individual Defendants have retained additional payments, not reflected in

Adtelligent's accounts or records, that should have been directed to Affluent Ads as well.  (Id.)

Defendants' unlawful scheme to simultaneously compete against Affluent Ads and divert

payments intended for the Company into their Chase Account or other accounts under their control has

caused, and continues to this day to cause irreparable harm to the Company, and violates their legal

obligations.  (Id. at ¶ 39.)

**D.     Affluent Ads Becomes Aware of Defendants' Misappropriation And Unlawful Competition When Investigating a Steep Decline in Revenue in LPN.**

While Defendants appear to have been operating their unlawful scheme since at least November 2014, Affluent Ads only recently became aware of their actions.  (Id. at ¶ 40.)  In response to steep revenue decline and sudden loss of key Clients in the LPN business in a short period in May and June 2016, Robbins requested that Caputo and Lynch provide explanations for the business loss.  (Id. at ¶ 41.) When their explanations did not withstand scrutiny, Robbins directed them to provide more detailed pipeline reports so that he could undertake a closer review of the LPN business.  (Id.)

When the pipeline reports did not provide clarity on the sudden revenue decline or client loss, on or about June 27th, 2016, Robbins started an investigation to better understand what they were doing with their time.  (Id. at ¶ 42.)   It was only through this investigation, over the course of several days ending on July 1st, 2016,  that Robbins and Affluent Ads first became aware of an entity called "Adtelligent" and that the Individual Defendants' were directly competing with their employer and had set up one or more separate bank accounts for such purposes.  (Id.)  Upon this discovery, Affluent Ads continued its investigation, and learned that this scheme had been taking place for several years, including the process of taking the revenue for "one out of every ten" sales generated by LPN for themselves.  (Id. at ¶ 43.)

Although its investigation is ongoing and cannot be completed without expedited discovery being sought in connection with its Motion for a Temporary Restraining Order and Preliminary Injunction, Affluent Ads understands that in one month alone, in just one of the Company's many Client industries (mortgage refinance) Defendants generated over $42,000 in revenue from two key Company Clients by unfairly competing with the Company through Adtelligent.  (Id. at ¶ 44.)   In addition to this unlawful competition, accepting Defendants' own plan of pocketing the revenue from "one out of every ten" sales generated by LPN for themselves, even if that pocketing of revenue earned by LPN was

limited to a few key Clients, Defendants would still have taken several hundred thousand dollars of additional LPN revenue from Affluent Ads.  (Id.)

Providing insight into Defendants' conduct and misrepresentations, a Client recently asked about payments made to Defendants' Chase Bank Account explained that the Individual Defendants had represented that "Adtelligent" was another name used by Affluent Ads to do business, and hence any money the Client sent to Adtelligent's Chase Account was going to Affluent Ads, thus deceiving a Client as well as Affluent Ads.  (Id. at ¶ 45.)

### E. Affluent Ads Gave Defendants an Opportunity To Explain and Defend Their Actions But Received No Bona Fide Response, and Terminated Their Employment.

On July 14, 2016, while still employed by the Company, Caputo and Lynch met with Robbins, Affluent Ads Co-Founder Stephen Gill ("Gill"), Affluent Ads' general counsel, and Affluent Ads' outside counsel regarding Affluent Ads' investigation into their conduct as of that date.  (Id. at ¶ 46.) At that meeting, Affluent Ads gave Caputo and Lynch an opportunity to explain their actions and take steps to remedy the damage they have caused.  (Id. at ¶ 47.)  Caputo and Lynch, however, refused to provide the Company with any information related to their misconduct, nor did they offer any explanation.  (Id. at ¶ 48.)   Instead, Caputo and Lynch ended the meeting with vague representations that the Company would be hearing from them or their legal counsel in connection with this matter.  (Id. at ¶ 49.)   To date, neither the Company nor its legal counsel have received further communications from any of the Defendants or those acting on their behalf.  (Id.).

At the July 14 meeting, Affluent Ads terminated Caputo's and Lynch's employment. (Id. at ¶ 50.)  Affluent Ads also took possession of Caputo's and Lynch's Affluent Ads' work computers, which are currently undergoing additional analysis for the purpose of further uncovering the scope of their unlawful action.  (Id.)

Without the benefit of injunctive relief, the Individual Defendants are to this day continuing to operate Adtelligent, relying upon and misappropriating Affluent Ads' confidential information, good will, and trade secrets, in violation of their contractual and obligations to the Company.  (Id. at ¶ 51.) This continued unlawful conduct includes communicating with, and doing business with, Affluent Ads' Clients and Publishers for the benefit of Defendants.  (Id.)  Indeed, their silence in response to being confronted by their actions strongly suggests they are using this time to continue their unlawful business schemes, or to destroy evidence of such schemes, rather than to meaningfully engage Affluent Ads regarding  their actions and steps they must take to attempt to rectify those actions.  (Id.)  Absent immediate injunctive relief, Affluent Ads will continue to suffer irreparable harm through Defendants' actions.  (Id.)  Thus, Affluent Ads had no choice but to file this Action.

## III.  ARGUMENT

### A.  Standard for Relief for a Preliminary Injunction

In exercising its discretion to issue a preliminary injunction pursuant to Federal Rule of Civil Procedure 65(a), this Court should consider four factors:

> [A] the likelihood that the applicant will prevail on the merits at final hearing;
> [B] the extent to which the plaintiffs are being irreparably harmed by the conduct complained of;
> [C] the extent to which the defendants will suffer irreparable harm if the preliminary injunction is issued; and
> [D] the public interest.

Opticians Ass'n of Am. v. Independent Opticians of Am., 920 F.2d 187, 191-92 (3d Cir. 1990) (internal citations omitted).  Here, as set forth below, all four factors weigh in favor of an injunction.

### B.  A Preliminary Injunction Is Necessary And Appropriate.

#### 1.  Affluent Ads Is Likely To Succeed on the Merits of Its Claims for Injunctive Relief

##### a.  Affluent Ads Is Likely To Succeed on the Merits of Its Federal and State Misappropriation Claims.

As the first two of three independent bases for the Court to conclude that Affluent Ads is likely to succeed on the merits of its claims for injunctive relief, both the recently-enacted Defend Trade Secrets Act ("DTSA") and the Pennsylvania Uniform Trade Secrets Act ("PUTSA") provide that actual or threatened misappropriation of a trade secret may be enjoined.  18 U.S.C. § 1832; 12 Pa.C.S. § 5303.[7] Misappropriation of a trade secret includes the "disclosure or use of a trade secret of another without express or implied consent by a person who . . . at the time of disclosure or use, knew or had reason to know that his knowledge of the trade secret was . . . acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use or derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use."  18 U.S.C. § 1839; 12 Pa.C.S. § 5302.

A "trade secret" under PUTSA is defined as:

> information, including a formula, drawing, pattern, compilation, including a customer list, program, device, method, technique or process that: (1) Derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure, and (2) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Id.; see also 18 U.S.C. §1839.  Under Pennsylvania law, in sum, the requisite elements of a trade secret are "substantial secrecy and competitive value to the owner."  Emergency Care Research Inst. v. Guidant Corp., No. 06-1898, 2007 WL 2702455, at *4 (E.D. Pa. Sept. 12, 2007) (quoting O.D. Anderson, Inc. v. Cricks, 815 A. 2d 1063, 1070 (Pa. Super. 2003)).  Factors relevant to these two primary elements include the following six sub-factors:

> (1) the extent to which the information is known outside of the owner's business;
> (2) the extent to which it is known by employees and others involved in the owner's business;
> (3) the extent of measures taken by the owner to guard the secrecy of the information;

---

[7]     DTSA and PUTSA have materially the same language as to what constitutes a trade secret and misappropriation of a trade secret.  The DTSA applies to trade secrets used in, or intended to be used in interstate or foreign commerce, which clearly applies to Plaintiff, as its business and relationships are national in scope and, in some instances, extend to the United Kingdom. As the DTSA was just enacted into law on May 11, 2016, there is scant caselaw applying the statute, hence case citations herein are to opinions interpreting PUTSA.

> (4) the value of the information to the owner and to his competitors;
> (5) the amount of effort or money expended by the owner in developing the information; and
> (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

SI Handling Sys., Inc. v. Heisley, 753 F.2d 1244, 1256 (3d Cir. 1985) (citing Restatement of Torts § 757 comment b (1939)); accord Emergency Care Research Inst, 2007 WL 2702455, at *5; Pestco, Inc. v. Assoc. Prods., Inc., 880 A. 2d 700, 706 (Pa. Super. 2005).  Here, consideration of the relevant factors and the record before the Court compels the conclusion that Affluent Ads likely can establish that several categories of information misappropriated by Defendants qualify as trade secrets under DTSA and PUTSA.

Here, there can be no doubt that Affluent Ads satisfies its obligation of establishing both trade secret status and actual/likely misappropriation.  As the co-leaders for LPN, Caputo and Lynch had access to and intimate knowledge of both Affluent Ads' Clients and Publishers, the relationships of which are closely-held trade secrets.  Based on the investigation to date, Defendants used that knowledge to transact business with Affluent Ads' Clients on their own behalf.  Affluent Ads developed these relationships and their knowledge of, for example, the effectiveness of Publishers over a number of years and with a great deal of investment.  Affluent Ads' detailed Publisher relationships and knowledge thereof provide competitive advantage and are safely guarded assets.

The elements of "substantial secrecy" and "competitive value to the owner" for this category of information are further illustrated by the six sub-factors.  First, the Client and Publisher information known to the Individual Defendants through their access to Affluent Ads' trade secrets are not available or known outside of the Company.  Second, Affluent Ads restricts access to that information through password protection and restricted internal access, and creates a culture of confidentiality through its policies.  Third, the Company does not disclose Publisher identity or relationship information to the public, even to Clients (or disclose Client relationship information to the public) and limits their access

on a "need to know basis."  Fourth, Defendants' misappropriation of the Client and Publisher

information gives them a clear competitive advantage in competing against Affluent Ads.  (Id.)  See

Den-Tal-Ez, Inc. v. Siemens Capital Corp., 566 A. 2d 1214, 1230 (Pa. Super. 1989) (concluding that

confidential cost-structure information represents a trade secret because it can be used to determine a

competitor's pricing methods and thus compete more effectively) (internal citation omitted).  Fifth,

Affluent Ads invested considerable resources in developing its Client and Publisher relationships and

knowledge, including its pricing and evaluation of Publishers, which further supports a conclusion that

they qualify as trade secrets.  See Omicron Systems, Inc. v. Weiner, 860 A. 2d 554, 564 (Pa. Super Ct.

2004) (holding that language from proposals constituted trade secrets where the language was part of an

overall project management methodology in which the firm had invested time and money); A.M. Skier

Agency v. Gold, 747 A.2d 936, 941 (Pa. Super. 1989) (concluding that client directory was a trade

secret because it had been compiled over the course of years through considerable expense and effort).

Sixth, Client and Publisher information could not easily be duplicated by legitimate means, as they are

based on years of effort and evaluation, including trial-and-error with using various Publishers for

different campaigns.  In sum, under the plain language of DTSA and PUTSA and as further

demonstrated above, Affluent Ads is likely to demonstrate that its Client and Publisher information

qualify as trade secrets.

      Similarly, Affluent Ads' strategic business planning information also have been kept

substantially secret and have competitive value to Affluent Ads.  See, e.g., Air Prods. & Chem., Inc. v.

Johnson, 442 A. 2d 1114, 1122 (1982) (concluding that strategic plans and market analyses were

protected as trade secrets).  This information is not known outside of the Company and is appropriately

protected within the Company, which further supports trade secret status.  Secured by password

protection, building security, and selective distribution, Affluent Ads has taken measures to safeguard

the secrecy of this information.  This information could not be replicated by legitimate means.  Armed with the information contained in the strategic plans to which the Individual Defendants had access, a competitor could predict the Company's next moves in the market and act accordingly without making their own investment of time and financial resources to develop them, which provides a competitive advantage. As demonstrated by the record and further illustrated above, Affluent Ads is likely to demonstrate that its strategic business plans constitute trade secrets under DTSA and PUTSA.

The record also supports a conclusion that Affluent Ads likely can show that Defendants misappropriated all of the information described above.  Defendants will not be able to articulate a plausibly legitimate basis for Caputo and Lynch to have competed directly with LPN, doing business with the same Clients as LPN in the same space, and likely the same Publishers, all while being paid to perform the same duties for Affluent Ads.    In sum, Affluent Ads is likely to succeed on the merits.

**b.      Affluent Ads Is Likely To Succeed on the Merits of Its Breach
of Non-Compete Agreements Claim.**

Although there is ample support for a conclusion that Affluent Ads is likely to succeed on the merits of its DTSA and PUTSA claims, the Court also may impose the requested injunctive relief for the alternative reason that the Company is likely so succeed on the merits of its breach of contract claim.

As an initial proposition, the Individual Defendants cannot conceivably suggest that their creation and operation of Adtelligent, as well as whatever separate competitive activity they are engaging in individually, through 925 Media or Blue Mule, or otherwise, does not breach their Non-Compete Agreements. Based on the investigation to date and information received from Clients, Defendants are offering services to customers in the same space occupied by Affluent Ads, including for the same Clients.  There is no doubt that Defendants are competing against Affluent Ads, soliciting Affluent Ads' Clients and Publishers to do so, and relying upon Affluent Ads confidential information (their knowledge of these relationships amongst other things) to do so.

25

Furthermore, the Non-Compete Agreements are reasonable and Affluent Ads is likely to succeed in seeking its enforcement in order to protect its legitimate competitive interests.  Restrictive covenants such as the non-competition and non-solicitation provisions in the Individual Defendants' Non-Compete Agreements are enforceable under Pennsylvania law if:  (1) they are ancillary to the employment relationship and supported by valid consideration; (2) are necessary to protect the legitimate business interest; and (3) are reasonably limited in duration and geographic scope.  Hess v. Gebhard & Co., 808 A. 2d 912, 917 (Pa. 2002).  Here, the Individual Defendants entered into the Agreements with Affluent Ads as a condition of their employment with the Company.  Therefore, Affluent Ads will be able to demonstrate that Defendants received sufficient consideration in exchange for their promises contained in the Agreements.

In addition, the terms of the Non-Compete Agreements are reasonably necessary to protect Affluent Ads' legitimate business interests, thus meeting the second prong of the Hess standard.  It is important to note first that it is Defendants' burden to prove that the restrictive covenants are unreasonable, a burden that they cannot meet.  John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc., 369 A. 2d 1164, 1169 (Pa. 1977) (burden of proof is on the defendant to show that a restrictive covenant is unreasonable or that it should not be enforced).

The courts applying Pennsylvania law have long recognized that employers have a legitimate interest in protecting their confidential information and investment in their business, including the training and development of their employees and customer and other third-party relationships.  Thermo-Guard, Inc. v. Cohran, 596 A. 2d 188, 193 (Pa. Super. 1991).  Restrictive covenants are considered particularly necessary where former employees had access to and knowledge of confidential information that would be highly valuable to competitors of the former employer.  See, e.g., Sidco Paper Co v. Aaron, 351 A. 2d 250, 252-53 (Pa. 1976); Wellspan Health v. Bayliss, 869 A. 2d 990, 997 (Pa. Super.

2005).

As senior managerial employees that led Affluent Ads' LPN business division, Defendants had knowledge of the Company's trade secrets and confidential information related to Clients and Publishers.  The Individual Defendants, in fact, had responsibility for developing those relationships, negotiating agreements with Clients and Publishers, understanding the effectiveness of Publishers, and developing strategy for LPN.  Affluent Ads relies on the information the Individual Defendants gained through their leadership of LPN to drive a substantial part of its business, and to provide quality service to its Clients through its intelligent reliance on Publishers to assist in marketing campaigns. The Individual Defendants' ability to rely upon that knowledge in direction competition in this commercial space would cause incalculable damage to the Company.  The Individual Defendants also have deep knowledge of Affluent Ads' strategic planning, which would allow them to target certain industries in competition with the Company without having to have expended the resources and efforts in identifying desirable new industries to service.  It is certain that Defendants exploit the Individual Defendants' knowledge of the Company's trade secrets and confidential information without injunctive relief, as Defendants have and will necessarily rely on the trade secrets and confidential information they acquired at Affluent Ads for their own benefit.

Finally, the Non-Compete Agreements are reasonably limited in duration and geographic scope, thus meeting the third prong of the Hess standard.  In evaluating this requirement, the courts will determine whether the noncompetition covenant imposes restrictions broader than necessary to protect the employer.  Bilec v. Auburn & Assoc., Inc. Pension Trust, 588 A. 2d 538, 542 (Pa. Super. 1991).  In this instance, the 18 month duration of the noncompetition and nonsolicitation covenant is unquestionably reasonable, as Pennsylvania courts have routinely and regularly enforced restrictive covenants of this duration and longer.  See, e.g., Worldwide Auditing Servs., Inc. v. Richter, 587 A.2d

772, 776 (Pa. Super. 1991) (upholding 2-year covenant, not to compete); <u>Coventry First, LLC v.</u>

<u>Ingrassia</u>, No. 05-2802, 2005 WL 1625042, at *8 (E.D. Pa. July 11, 2005) (enforcing 3-year restriction,

on finding that Pennsylvania Supreme Court has often upheld 3-year covenants not to compete; stating

that, in light of this precedent, "this [c]ourt will not alter the three-year, time restriction imposed here.").[8]

Similarly, courts regularly enforce noncompete covenants lacking geographic limits where the

employee's duties and employer's customers were geographically broad.  <u>See</u> <u>Quaker Chem. v. Varga</u>,

509 F. Supp 2d 469,476 (E.D. Pa. 2007) (collecting cases with broad geographic scope); <u>National Bus.</u>

<u>Servs., Inc. v. Wright</u>, 2 F. Supp. 2d 701, 708 (E.D. Pa. 1998) (citing <u>Graphic. Mgmt. Assocs., Inc. v.</u>

<u>Hatt</u>, No. 97-6961, 1998 WL 159035, at *14 (E.D. Pa. Mar. 18, 1998) (upholding covenant restricting

defendant, from competing with plaintiff in all of North America); <u>Volunteer Firemen's Ins. Servs., Inc:</u>

<u>v. CIGNA Prop. & Cas. Ins. Agency</u>, 693 A.2d 1330 (Pa. Super. Ct. 1997)).  Here, the Individual

Defendants' knowledge and skillset was used by Affluent Ads to work with Clients and Publishers

regardless of geographic location and the harm in Defendants providing similar services is not limited to

a particular geographic area.

As such, Affluent Ads is likely to succeed on the merits of its claim for injunctive relief for

Defendants' violation of their Non-Compete Agreements.

## 2.    Affluent Ads Will Suffer Irreparable Harm Absent Injunctive Relief.

There can be no doubt that Affluent Ads will suffer irreparable harm absent the requested

injunctive relief.  "Irreparable harm" is harm that cannot be easily quantified or measured for the

purpose of calculating ex-post facto monetary damages.  <u>See, e.g.</u>, <u>National Business Services, Inc. v.</u>

---

[8]      <u>See also</u> <u>Piercing Pagoda v. Hoffner</u>, 351 A. 2d 207, 211 (Pa. 1976) (injunctive relief granted to enforce three-year restriction on competition); <u>DeMuth v. Miller</u>, 652 A. 2d 891 (Pa. Super. 1995) (five-year noncompetition restriction enforced); <u>Geisinger Clinic v. DiCuccio</u>, 606 A. 2d 509 (Pa. Super. 1992) (two-year noncompetition agreement enforced); <u>Blair Design & Construction Co. v. Kalimon</u>, 530 A. 2d 1357, 1360 (Pa. Super. 1987) (affirming three-year injunction); <u>John G. Bryant Co., Inc. v. Sling Testing and Repair, Inc.</u>, 369 A. 2d 1164, 1170 (Pa. 1977) (enforcing a three-year noncompetition agreement).

Wright, 2 F. Supp. 2d 701, 709 (E.D. Pa. 1998) ("Harm is irreparable when it cannot be adequately

compensated in damages, either because of the nature of the right that is injured, or because there exists

no certain pecuniary standards for the measurement of damages.") (internal citations omitted).  As

established above, the injury to Affluent Ads' business caused by the misappropriation is not adequately

compensable in monetary damages.  See Chmura v. Deegan, 398 Pa. Super. 532, 537 (Pa. Super. 1990)

(concluding that the "allegation that [defendant] was misappropriating trade secrets supplied the

irreparable harm requirement for the issuance of a preliminary injunction").  The use or disclosure of

trade secrets certainly constitutes irreparable harm.  See SI Handling Sys., Inc. v. Heisley, 753 F.2d

1244, 1264 (3d Cir. 1985) (concluding that the plaintiff demonstrated a threat of irreparable harm by

showing that defendants intended to use plaintiff's trade secrets); Union Carbide Corp. v. UGI Corp.,

731 F.2d 1186, 1192 (5th Cir. 1984) (applying Pennsylvania law) ("[D]isclosure of strategic information

would cause Carbide irreparable harm in the absence of injunctive relief prior to the completion of

litigation on the merits."); Ecolaire Inc. v. Crissman, 542 F. Supp. 196, 205 (E.D. Pa. 1982) ("There is

no doubt but that ASH will suffer significant, irreparable injury to its business if defendants are

permitted to continue their program of unfair competition and use of ASH proprietary information.").

     As set forth above, Defendants' unauthorized use and misappropriation of Affluent Ads' trade

secrets and confidential information in unlawful competition with the Company creates an immediate

and irreparable threat to Plaintiff's business.  See Fisher Bioservices, Inc. v. Bilcare, Inc., No. 06-567,

2006 WL 1517382, at *12 (E.D. Pa. May 31, 2006) (concluding that the use of a company's confidential

information qualified as the type of injury which would constitute irreparable harm that cannot be

compensated with monetary damages).  These actions pose an immediate threat to Affluent Ads's

reputation, customer goodwill and market share.  See, e.g., Pappan Enters., Inc. v. Hardee's Food Sys.,

Inc., 143 F.3d 800, 805 (3d Cir. 1998) ("Grounds for irreparable injury include loss of control of

reputation, loss of trade, and loss of goodwill.").  For example, Defendants' continued ability to use the Individual Defendant's knowledge of and about Clients and Publishers, and Affluent Ads' relationships and contractual terms with both, will permit them to undercut the Company in securing business.  There can be little doubt, based on their actions to date, that Defendants will continue to unlawfully use Affluent Ads' trade secrets and confidential information for their enrichment and to Affluent Ads' detriment absent judicial intervention.

Further, the Individual Defendant's Non-Compete Agreements lends further support to a finding of irreparable harm.  Indeed, the parties explicitly acknowledge that violations of the covenants, as the Individual Defendants have done, would be "irreparable" and that "an award of monetary damages to the Company for such breach would be an inadequate remedy."  (Ex. 1, ¶ 7, to Robbins Dec.)  Under these circumstances, it is clear that the harm caused to Affluent Ads by Defendants would be irreparable and requires the requested injunctive relief.

### 3.    Defendants Will Not Suffer Irreparable Harm If An Injunction Is Issued.

As discussed above, Affluent Ads will suffer irreparable harm without the protection of injunctive relief.  Were this Court to grant the Company's request for relief, however, Defendants would suffer no legitimate injury.  The issuance of an injunction would merely prevent them from misappropriating Affluent Ads' information or for working in a competitive capacity until the Court can hold a hearing.  Defendants, therefore, have no equitable claim to harm caused by an injunction issued in response to actions, which clearly constitute a breach of the Non-Compete Agreements and violation of Defendants' duties to Affluent Ads.

Separate and apart, it was Defendants who opted to unlawfully compete against Affluent Ads while the Individual Defendants were employed by the Company.  While the benefits that Defendants gained through their access to Affluent Ads' trade secrets and confidential information could aid them in

PHIL1 5573110

their unlawful competition, they cannot turn their deceitful and unlawful conduct into an argument for irreparable harm.

### 4.    Injunctive Relief Is in the Public Interest

Based on the facts here, the public interest is served by an injunction.  The public has an interest in protecting trade secrets and legitimate business interests, as well as preventing unlawful competition. See Fisher, 2006 WL 1517382, at *21 (concluding that granting injunctive relief would serve the public interest because it will "discourage . . . the wrongful use of confidential information and trade secrets . . .") (internal citations and quotations omitted); Siemens Building Technologies, Inc. v. Camacho, 168 F. Supp. 2d 425, 427 (E.D. Pa. 2001) (holding that it is in the public interest to protect legitimate business interests).  Thus, an injunction is necessary and appropriate not only to prevent harm to Affluent Ads, but also to prevent harm to similar business relationships.  Finally, considering the narrow scope of the injunctive relief requested, any public interest in promoting legitimate competition among companies certainly is not impaired.

### C.    The Court Should Issue A Temporary Restraining Order To Prevent Immediate Irreparable Harm To Affluent Ads Pending a Prompt Hearing on the Motion for a Preliminary Injunction.

The standard for obtaining a Temporary Restraining Order is very similar to the standard for obtaining a preliminary injunction:

> To obtain a temporary restraining order in this Circuit, the moving party has the burden of showing (a) a reasonable likelihood of success on the merits; (b) that it will suffer irreparable harm absent such relief and (c) that on balance the equities and the public interest favor such relief.  See, e.g., American Greetings Corp. v. Dan-Dee Imports, Inc., 807 F.2d 1136, 1140 (3d Cir. 1986) and cases cited therein.

Graphic Mgmt. Assoc., Inc. v. Honegger, No. 94-0825, 1994 WL 59369, at *1 (E.D. Pa. Feb. 25, 1994) (granting temporary restraining order).  For the reasons stated above, this standard has been met here. Because Defendants' continued access to and use of Affluent Ads's trade secrets in violation of their

contractual obligations would cause irreparable harm, the requested relief should not be delayed and additional notice to Defendants should not be required.  See Fed. R. Civ. P. 65(b).

### 1. <u>Irreparable Harm Will Result if Relief Is Delayed</u>

While the Individual Defendants' employment have been terminated, there is currently no restriction by which Defendants have demonstrated any intent to abide that would prevent them from continuing to engage in their unlawful behavior.  Every day that goes by without the relief sought herein allows the Defendants to further their scheme of competing unfairly in reliance on Affluent Ads' trade secrets and confidential information, to destroy, hide, or modify the scope of their conduct, and to further erode Affluent Ads' relationships with its Clients and Publishers by trading on the good will generated through their association with Affluent Ads in furtherance of their own competitive enterprise. Absent immediate relief, no court will be able to put the genie back in the bottle.  It therefore is imperative that the Court grant the TRO to prevent significant harm from being done, but every day that passes makes it less likely that the damage caused by Defendants can be contained.  Moreover, the relief afforded by the temporary restraining order would not prejudice any legitimate interest of Defendants for the reasons discussed above and because the relief will extend only through a brief period of expedited discovery followed by a prompt hearing on Affluent Ads' request for a preliminary injunction.

### 2. <u>Additional Notice Is Not Required</u>

Affluent Ads has put Defendants on notice regarding the injunctive relief sought in this instant Motion.  Specifically, at the July 14th meeting, Defendants were informed of Affluent Ads' intent to proceed with legal action absent satisfactory resolution.  In addition, Affluent Ads' outside counsel emailed the Individual Defendants at their personal email addresses the Complaint and motion package it filed with this Court, prior to filing.  (<u>See</u> Certification of Counsel's Compliance.)  Defendants are thus fully aware of Affluent Ads' intent to seek immediate relief in this Court at this time.  Further delay

would irreparably prejudice Affluent Ads.  Therefore, Affluent Ads seeks a temporary restraining order just long enough for expedited discovery and a formal, noticed hearing on a preliminary injunction to take place.  Under such circumstances, additional notice prior to the issuance of a temporary restraining order should not be required.

## IV.      <u>CONCLUSION</u>

For all the reasons stated herein, Affluent Ads respectfully requests that the Court issue a Temporary Restraining Order in the form filed herewith pursuant to Federal Rule of Civil Procedure 65(b) and, after notice and a hearing, a Preliminary Injunction pursuant to Federal Rule of Civil Procedure 65(a) to provide the relief set forth in its Motion.  Additionally, Affluent Ads respectfully requests that the Court order the parties to engage in expedited discovery in order to facilitate the presentation of an appropriately developed record at the preliminary injunction hearing.

Respectfully submitted,

July 21, 2016

/s/ Jonathan S. Krause
Jonathan S. Krause, Esq.
KLEHR HARRISON
HARVEY BRANZBURG LLP
1835 Market Street, Suite 1400
Philadelphia, PA  19103
ph (215) 569-4496
fax (215) 568-6603
jkrause@klehr.com

Counsel for Plaintiff
Affluent Ads, LLC

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that a true and correct copy of the foregoing Plaintiff's

Motion for Temporary Restraining Order and Preliminary Injunction, Memorandum of Law in

support thereof, proposed form of Orders, and Declaration of Zachary Robbins and supporting

exhibits were served upon the below on this date by FedEx and email:

Jovan Caputo                          Phillip Lynch
78 Ketewamoke Ave.                    141-08 Rockaway Beach Blvd.
Babylon, NY 11702                     Belle Harbor, NY 11694
jovancaputo@gmail.com                 ptlynch8223@hotmail.com


Adtelligent Media, LLC
c/o Phillip Lynch
92 Broadway, Suite 4
Amityville, NY 11701
ptlynch8223@hotmail.com


Dated: July 21, 2016                  /s/ Jonathan S. Krause_____
                                      Jonathan S. Krause